**In re AMPICILLIN ANTITRUST LITIGATION.**

M.D.L. No. 50.
Misc. 45–70.

United States District Court,
District of Columbia.

March 20, 1978.

David I. Shapiro, James vanR. Springer, Washington, D. C., for city-county-state plaintiffs.

Richard H. Stern, Thomas H. Liddle, Dept. of Justice, Antitrust Div., Patent Section, Washington, D. C., for plaintiff, the United States.

Robert F. Dobbin, New York City, Richard A. Whiting, Washington, D. C., for defendants, Beecham Group Limited and Beecham, Inc.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Plaintiffs in these consolidated cases seek discovery of documents which have been identified by the defendants, Beecham Group Limited and Beecham, Inc. (Beecham), in their responses to interrogatories submitted by the plaintiffs. Beecham, however, refused to produce many of these documents, asserting the protection of the attorney-client privilege.[1] Plaintiffs then filed motions to compel production under Fed.R.Civ.P. 37(a). Because these motions involved complicated issues and over 700 documents, the Court appointed a Special Master for the purpose of ruling on these privilege claims.[2] The Master has filed four reports, dated June 7, 1974 (Reports IA and IB), July 8, 1975 (Report 9), and August 15, 1975 (Report 10), relating to separate groups of documents, to which Beecham has raised both preliminary and substantive objections. These reports are now before the Court for review.[3]

1. In addition, for a few documents, Beecham has claimed protection under the attorney work product doctrine. This claim is discussed in the rulings, set forth in the accompanying Order, on the documents for which each claim was made.

2. As discovery continued, additional motions were filed relating to the production of documents and other matters. Some of these motions were also referred to the Master, and as a result he has issued a total of ten reports, including the four reviewed in this Opinion. Two of the reports have been ruled on in this Court's Orders of August 15, 1977 (Report 5)

and of January 18, 1978 (Report 6). Report 4 is a supplement to Report IA and requires no action by the Court. The other three reports (3, 7, and 8) were ruled on in separate orders dated March 3, 1978.

3. The Court has a duty to review a Master's report and make the final determination of all the issues. *See Rogers v. Societe Internationale,* 107 U.S.App.D.C. 388, 278 F.2d 268, *cert. denied,* 364 U.S. 895, 81 S.Ct. 223, 5 L.Ed.2d 189 (1960). While under Fed.R.Civ.P. 53(e)(2), findings of fact are to be accepted unless clearly erroneous, " 'in no instance is [the judge] bound by the master's conclusions of law.' "

In its responses to the reports, Beecham has raised two preliminary objections. First, Beecham contends that the Master's Reports should not be treated as "findings of fact" because the Court's referral order only stated that the Master was to make "recommendations." Second, Beecham asserts that Reports IA and IB are invalid because the Master failed to hold evidentiary hearings. For the reasons hereinafter set forth in Part II, the Court rejects and overrules these objections.

In addition, Beecham has raised three substantive objections to the Reports. Specifically, it has claimed that the Master, in examining Beecham's attorney-client privilege claims, erred: (1) in applying the "control group" test to communications involving employees of a corporation; (2) in requiring that a communication must contain confidential information or facts in order for it to be a confidential one; and (3) in refusing to accord the privilege to the communications of a patent agent.

For the reasons hereinafter set forth in Part III, the Court decides not to accept the Master's conclusions of law, but instead will apply the legal standards articulated in Part III. Therefore, in its rulings on the documents affected by this decision, the Court has not been bound by the Master's findings of fact. The Court's findings for these documents are set forth in the accompanying Order under the heading "Reason/Description."

With respect to all of the other rulings and findings of the Master not expressly modified or rejected in this Memorandum Opinion or the accompanying Order, the Court finds them to be correct both in law and in fact.

> *Id.*, 107 U.S.App.D.C. at 392, 278 F.2d at 272, quoting *D. M. W. Contracting Co. v. Stolz*, 81 U.S.App.D.C. 334, 336, 158 F.2d 405, 407 (1946), *cert. denied* 330 U.S. 839, 67 S.Ct. 980, 91 L.Ed. 1286 (1947). The Court is also free to modify the report, or may reject it in whole or in part. Fed.R.Civ.P. 53(e)(2).

4. The Court, however, will not permit the plaintiffs, first to review the opinion of the Court, and then to interpose objections. Specific ob-

## I. FACTUAL BACKGROUND

■ In 1973, the City-County-State plaintiffs (CCS plaintiffs) served on Beecham interrogatories which included requests for certain documents. Beecham refused to produce numerous documents, claiming that most of them were protected either in whole or in part by the attorney-client privilege. On November 19, 1973, the CCS plaintiffs filed an amended motion to compel production of the documents under Fed.R.Civ.P. 37(a), to which Beecham filed a response, accompanied by affidavits, again asserting that the documents were privileged. On January 28, 1974, the Court ordered Beecham to supply a justification for each document or portion thereof that was claimed as privileged. Affidavits and voluminous indices were filed in compliance with this Order. The Court then appointed John D. Lane, Esquire, as Special Master to consider the arguments advanced by the parties, examine the documents in question, and make recommendations on the claims of privilege. The Master filed his first report in two parts, entitled: (1) "Report of the Master on Claims of Attorney-Client Privilege Relative to 443 Documents Claimed Privileged in Their Entirety by Defendant Beecham" (Report IA), and (2) "Report of the Master on Claims of Attorney-Client Privilege for Portions of 302 Documents (Masked Documents) by Defendant Beecham" (Report IB). Beecham asserted a number of objections to these Reports which were opposed by the plaintiffs. Plaintiffs stated that they had no objections of their own to the reports, but then went on to advance a number of arguments they sought to have considered if the Court were to rule in favor of Beecham's objections.[4]

> jections must be made, if at all, at the time the Master files his report. While the Court is aware that the CCS plaintiffs, in an effort to achieve an expedited resolution of the discovery disputes, have chosen not to assert several objections, they cannot condition their assertion of objections upon the Court's opinion. However, to the extent the plaintiffs have stated their objections in at least a general way, these objections have been considered.

On October 7, 1974, this Court held a hearing on these reports, and after further consideration of the reports, the Court remanded Reports IA and IB to the Master for reconsideration. On August 8, 1975, the Master issued a report entitled "Report on Beecham Documents Held Non-Privileged Under the Control Group Theory" (Report 9). Again, Beecham filed objections and the plaintiffs responded.

On July 31, 1974, plaintiffs filed a supplemental motion to compel production of documents under Fed.R.Civ.P. 37(a) to obtain discovery of some 269 additional documents. The motion challenged the attorney-client privilege claims asserted by Beecham with respect to the documents identified by the defendants in response to additional interrogatories filed by the plaintiffs. This supplemental motion was also referred to the Master, and on August 18, 1975, the Master issued a report entitled "Report on Supplemental Rule 37 Motion Against Beecham Defendants" (Report 10), to which objections were filed by Beecham.

Beecham, in its objections, has not taken issue with the rulings on all of the 745 documents in Reports IA, IB, and 9. In Report IA, the Master sustained Beecham's claims as to 320 documents. Of the remaining documents, Beecham has not opposed the Master's recommendation as to 47 documents, leaving 76 disputed documents which Beecham has identified in the appendix to its July 9, 1974 memorandum. As to Report IB, the Master has recommended that Beecham's claims of privilege be sustained as to 186 documents. Beecham has disputed the recommendations of the Master as to 74 of the remaining 116 documents. And, as to Report 9, the Master has recommended that Beecham's claims of privilege be denied on all but one document. Beecham has objected to all of the recommendations contained in this report, except for that document on which its claim was sustained. Of the 269 documents at issue in Report 10, the Master has recommended sustaining Beecham's privilege claims on 140 of them. Of the remaining 129 documents, Beecham does not object to the recommended denial of the privilege as to 34 documents, leaving 95 documents still in dispute.

The Court will address the two preliminary objections raised by Beecham before considering the objections to the Master's rulings on the attorney-client privilege claims.[5]

## II. PRELIMINARY OBJECTIONS

■ Beecham's first objection involves what standard of review is to be applied to the Master's reports. Under Fed.R.Civ.P. 53(e)(2), the standard of review of a Master's report, if it contains findings of fact, is that "the court shall accept the master's findings of fact unless clearly erroneous." Beecham, however, argues that the Court cannot consider the reports as containing "findings of fact" because the Court's referral order only stated that the Master was to make "recommendations"[6] and because, in any case, the Master did not actually make any findings of fact. The Court has examined Master Lane's reports in their entirety and finds that the conclusions, although labeled recommendations, are based on clearly articulated legal standards and a thorough examination of the documents. Additionally, for each ruling, the Master includ-

---

5. All parties declined an opportunity for oral argument or hearing on any issue raised in these Master's reports (although Beecham has submitted a supplemental memorandum, dated March 3, 1978, relating to its claims of privilege for communications involving its chartered patent agent), and therefore have waived any right to oral argument or hearing.

6. Beecham, in its brief, relies on *In Re Van Sweringen Corp.*, 180 F.2d 119 (6th Cir. 1950), in support of its position that there is a distinction between "recommendations" and "findings of fact." While such a distinction may exist, the opinion in that case is explicit that the court did not rely solely on the terminology used, but instead looked to the substance of the Master's report which "clearly differentiates those elements in the report which may be construed as findings, from those which are clearly designated as recommendations." *Id.* at 121. For the reasons set forth in this Opinion, the "recommendations" shall constitute findings of fact.

ed a statement of the reasons on which he based each conclusion. These statements and the discussion of the general legal standards he was applying are sufficient for the Court and the parties to understand the basis of the Master's recommendations. Therefore, the Master's factual recommendations shall constitute findings of fact and will be accepted unless clearly erroneous.[7]

■ Secondly, Beecham has objected to the findings in Reports IA and IB because the Master did not hold evidentiary hearings which, it contends, are required by Fed.R.Civ.P. 53(d)(1). The rule provides that, upon receiving the order of reference, "the Master shall forthwith set a time and place for the first meeting of the parties . . . ." However, this provision seems designed to ensure that there will be no delay in having the Master proceed with his duties. In situations such as the case at bar, where the Master is reviewing documents claimed to be privileged, there is no need to require a formal meeting. Also, Rule 53(c) which describes the broad discretion given the Master, states that "[he] has and shall exercise the power . . . to do all acts and take all measures necessary or proper for the efficient performance of his duties under the order." Moreover, Beecham has not been prejudiced. In its July 9, 1974 memorandum, it stated that it was "surprised" by the Master's decision, in Reports IA and IB, to apply a certain legal standard (the "control group" test, discussed in part IIIA *infra*), and had there been hearings, it would have submitted evidence to show that certain communications met this test. However, after the Court remanded Reports IA and IB to the Master for reconsideration, Beecham was given the opportunity to present evidence at a hearing before the Master. Therefore, since the Master proceeded with all due diligence to complete his reports and Beecham has not shown that it was prejudiced, the Court will not reject the Master's reports because of this objection.

---

7. Of course, for findings based on a legal standard which the Court determines to be incor-

## III. ATTORNEY–CLIENT PRIVILEGE OBJECTIONS

■ Before the Court addresses the specific objections Beecham has raised to the Master's rulings on the attorney-client privilege, it is necessary to set out the purpose and the elements of the privilege. The purpose of the attorney-client privilege is to encourage the complete disclosure of information between an attorney and the client and to further the interests of justice. Communications that fall within the purview of the privilege are thus rendered immune from discovery. *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 32 (D.Md.1974); 8 Wigmore, *Evidence* § 2291 (McNaughton rev. 1961).

In *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59 (D.Mass. 1950), Judge Wyzanski set forth the now well-accepted requirements of the attorney-client privilege:

> The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In addition, Professor Wigmore has stated the essentials of the privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the

---

rect, the clearly erroneous standard is no longer applicable.

legal adviser, (8) except the protection be waived.

8 Wigmore, *supra*, at § 2292.

■ While the privilege serves a very important purpose, the Court is aware of the fact that it may nevertheless be an obstacle to the investigation of the truth. Therefore, the privilege ought to be "strictly confined within the narrowest possible limits consistent with the logic of its principle." *Id.* at § 2291 (footnote omitted). The Court, therefore, views its duty as that of achieving a balance between the need for the disclosure of all relevant information and the need to encourage free and open discussion by clients in the course of legal representation.

The Court comes now to consideration of three issues discussed in the Master's reports and objected to by Beecham: (1) whether the control group test is the appropriate one to determine which employee communications are within the attorney-client relationship when the client is a corporation; (2) whether a communication must contain confidential information in order for it to be a confidential one and therefore privileged; and (3) whether the attorney-client privilege applies to communications involving patent agents.

A. *To Determine Which Employee Communications Are Within The Attorney-Client Relationship When The Client Is The Corporation, The Court Must Examine The Relevance Of The Communication To A Particular Legal Problem; As A Result, Neither The "Control Group" Test Nor The Harper And Row Test Is Wholly Adequate.*

■ One of the issues raised by the Beecham defendants in their objections to Reports IA and IB of the Master was the appropriateness of the "control group" test for determining which employee communications are within the attorney-client relationship. After consideration of the reports, the objections to the reports, and the responses to the objections, this Court, by Order entered May 30, 1975, remanded the reports to the Master for further consideration of the appropriateness of the "control group" test. The Court also ordered Beecham to file a statement providing detailed information about each document for which Beecham contended that the Master had erroneously approved the "control group" test. The Master, after reconsideration, submitted a report on August 8, 1975 (Report 9). Beecham has filed objections to the Report, and the plaintiffs have responded thereto.

■ In Reports IA and IB, the Master, relying on *Natta v. Hogan,* 392 F.2d 686 (10th Cir. 1968); *Garrison v. General Motors Corp.,* 213 F.Supp. 515 (S.D.Cal.1963); and *City of Philadelphia v. Westinghouse Electric Corp.,* 210 F.Supp. 483 (E.D.Pa.1962), recommended the use of the "control group" test. Under this test, "[d]ocuments available to persons who are neither lawyers nor control group members are not privileged," 392 F.2d at 693, and, to determine whether a person is a member of the control group,

the test is whether the person has the authority to control, or substantially participate in, a decision regarding action to be taken on the advice of a lawyer, or is an authorized member of a group that has such power.

392 F.2d at 692.

Upon reconsideration, in Report 9, the Master recommended that the Court adopt the test applied in *Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487 (7th Cir. 1970), *aff'd per curiam* by an equally-divided court, 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971). In that case, the Seventh Circuit, concluding that the control group test was not wholly adequate, expanded the test so that:

. . . an employee of a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is

sought by the corporation and dealt with in the communication is the performance by the employee of the duties of his employment.

423 F.2d at 491–92.

For the reasons hereinafter stated, the Court, after careful consideration of the purposes of the attorney-client privilege and the realities of corporate management, concludes that neither the control group nor the *Harper & Row* test is, in itself, sufficient.[8] Accordingly, the Court will adopt the following test: Before the attorney-client privilege may be claimed for employee communications, the following requirements must be met:

1) The particular employee or representative of the corporation must have made a communication of information which was *reasonably believed to be necessary to the decision-making process* concerning a problem on which legal advice was sought;

2) The communication must have been made for the purpose of securing *legal* advice; [9]

3) The subject matter of the communication to or from an employee must have been related to the performance by the employee of the duties of his employment; and

4) The communication must have been a confidential one, as discussed in Part III B of this opinion.

This approach is preferable to the control group test in that it examines the relevance of the communication to a particular legal problem,[10] not to the status of the person making the communication. This test would also limit the availability of the privilege more than would the *Harper & Row* test, so that the privilege will be "strictly confined within the narrowest possible limits consistent with the logic of its principle." 8 Wigmore, *Evidence* § 2291, at 554 (McNaughton rev. 1961).

Both the control group test and the *Harper & Row* test have been the subject of critical legal commentary.[11] The control group test has been criticized for failing to recognize that many of the employees who have the business information that an attorney needs to know before he can render legal advice [12] are not those with authority

8. This was also the conclusion of the Eighth Circuit sitting *en banc*, in *Diversified Industries v. Meredith,* 572 F.2d 596 (8th Cir. 1978), which held that neither the control group nor the *Harper & Row* test was wholly adequate. The test adopted by this Court, while similar to the one in *Diversified Industries* (*see* at 602), is more limited in that it requires a close relationship between the communication and a decision on the legal problem (or at least a reasonable belief of such a relationship) rather than a request by a superior to an employee that the communication be made.

9. *See* J. Weinstein and M. Berger, *Weinstein's Evidence,* ¶ 503(b)[04], at 503–45 (1975) [hereinafter, *Weinstein's Evidence* ].
 Thus, a status report on the corporation's activities does not become immune from discovery merely because a copy is transmitted to counsel with no accompanying request for legal advice. Nor do minutes of meetings become privileged by the mere presence of counsel. *Air-Shield, Inc. v. Air Reduction Co.,* 46 F.R.D. 96, 97 (N.D.Ill.1968). It is essential that there be a request for, or a conveyance of, legal advice.

10. By "relevance of the communication to a particular legal problem," the Court does not intend to imply that a communication will only

be protected if it, in fact, contains information necessary to the decision-making process for a particular legal problem, because such an *ex post facto* approach would discourage full disclosure by an employee who may not know what information is necessary. What is meant is that communications made in *the reasonable belief that they contain such necessary information* will be protected. However, communications which contain no such reasonable belief, either because of the status of the employee or because of the nature of the information, will not be protected.

11. *See* 2 *Weinstein's Evidence,* ¶ 503(b)[04] (1975).

12. This need by the attorney to communicate with a number of employees who are at various status levels in the corporation will be particularly strong when there are antitrust and patent issues, as in the case at bar. In such instances, much of the sales and technical information will be known only by the sales people and engineers or researchers, individuals who would not be included in any control group. *See Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1164–65 (D.S.C.1974).

to speak or act for the corporation.[13] Under this test, communications involving these mid-level managers and blue-collar employees could not be protected. The major criticism of the *Harper & Row* test is that, by requiring only that the communication by the employee be at the direction of his superiors and relate to the duties of his employment, corporations could protect as privileged much information by directing "all their employees to channel all their business reports to corporate attorneys."[14]

Courts are divided as to which test to apply.[15] *Compare Virginia Electric and Power Co. v. Sun Shipbuilding & D. D. Co.,* 68 F.R.D. 397 (E.D.Va.1975) and *Burlington Industries v. Exxon Corp.,* 65 F.R.D. 26 (D.Md.1975) (adopting the control group test), *with Hasso v. Retail Credit Company,* 58 F.R.D. 425 (E.D.Pa.1973) and *Sylgab Steel & Wire Corp. v. Imoco-Gateway Corp.,* 62 F.R.D. 454 (N.D.Ill.1974), *aff'd without opinion,* 534 F.2d 330 (7th Cir. 1976), (adopting the *Harper & Row* test). *See also Mead Data Central, Inc. v. United States Department of Air Force,* 184 U.S.App.D.C. 350, 566 F.2d 242 (1977).[16]

In this Court's view, the most well-reasoned analysis of this issue, in light of the purposes of the attorney-client privilege when the client is a corporation, is *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146 (D.S.C.1974). *Duplan* involved, as does the case at bar, both antitrust and patent issues. Although the court stated that it would apply the control group test, it stated that it would do so "taking a common sense look at the practicalities of the 'control group' test and its applicability in the day-to-day workings of a lawyer . . . ." *Id.* at 1164. After citing the language of the control group test which limits the availability of the attorney-client privilege to those who can speak or act for the corporation, the court noted that:

> [A] corporation] cannot deal solely through the chairman of the board of directors. There has to be a sufficient number of persons within a corporation who are authorized on behalf of the corporation to seek advice, to give information with respect to the rendition of advice, and to receive advice.

. . . . .

the court went on to say that "[w]here the client is an organization, the privilege extends to those communications between attorneys and all agents or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication. [citations omitted]. *But see Harper and Row Publishers, Inc. v. Decker,* [citation omitted]. . . ." 184 U.S.App.D.C. at 361, n.24, 566 F.2d at 253 n.24. The court acknowledged that the case before it was a FOIA one in which common law privileges, such as the attorney-client one, apply only by "rough analogy," 184 U.S.App.D.C. at 360, 566 F.2d at 252, and that there is an overall congressional intent of ensuring comprehensive public access to government records, 184 U.S.App.D.C. at 363 n.28, 566 F.2d at 255 n.28. But, as the court itself stated, there is a need "to ensure that a client receives the best possible legal advice, based on a full and frank discussion with his attorney . . . ." 184 U.S.App.D.C. at 360, 566 F.2d at 252. Therefore, at least for the case at bar, which is not a FOIA case and does involve antitrust and patent issues (see n.10, *supra*), the control group test is not the one that will best achieve the objective of a full and frank discussion.

---

**13.** *See* Burnham, *Confidentiality and the Corporate Lawyer: The Attorney-Client Privilege and "Work Product" in Illinois,* 56 Ill.B.J., 542 (1968); Pye, *Fundamentals of the Attorney-Client Privilege,* 15 Prac.Law. 15 (1969).

**14.** Note, *Privileged Communications—Inroads on the 'Control Group' Test in the Corporate Area,* 22 Syr.L.Rev. 759, 766 (1971). *See* Note, *Attorney-Client Privilege for Corporate Clients: The Control Group Test,* 84 Harv.L.Rev. 424 (1970).

**15.** Two recent District of Columbia decisions which have acknowledged the split between the two tests, but did not have to choose which to adopt, are *Attorney General of the United States v. Covington & Burling,* 430 F.Supp. 1117 (D.D.C.1977), and *F. T. C. v. Lukens Steel Co.,* 444 F.Supp. 803 (D.D.C.1977).

**16.** While the *Mead Data* court did not have to decide the issue of whether certain employee communications were protected, it did discuss the general principles that govern the application of the attorney-client privilege for legal opinions in an exemption five claim under the Freedom of Information Act [FOIA]. After stating that the privilege does not apply if information has been shared with third parties,

This is an antitrust case. If the chairman of the board and the president of a corporation were to seek advice on antitrust law, the only way that a lawyer can really understand how a corporation operates, what it is doing, and what it can do within the confines of the antitrust laws, is to go out into the branch offices and into the field to make the rounds with the salesmen. . . . If an attorney cannot make enquiries of salesmen and if the attorney cannot give advice to the corporate personnel who will apply it, then a corporation would be reluctant to seek legal advice since its confidential communications would not be protected by the attorney-client privilege. . . . Unless corporate personnel on a fairly low level can speak to attorneys in confidence, the enforcement of the federal antitrust laws is likely to be adversely affected.

*Id.* at 1164. The court then concluded that "the main consideration is whether the particular representative of the client, to whom or from whom the communication is made, is involved in rendering information necessary to the decision-making process concerning a problem on which legal advice is sought." *Id.* at 1165.

The *Duplan* court then proceeded to consider the *Harper & Row* case, and interpreted that case as establishing a "subject matter" test as a necessary corollary to the control group test. *Id.* at 1165. According to *Duplan*, this subject matter test imposed the additional requirement that the subject matter of the employee-attorney communication be the performance by the employee of the duties of his employment.

While this Court does not necessarily agree with the *Duplan* court's characterization of what the control group and the *Harper & Row* tests were intended to mean, this Court does agree with the basic approach taken by the *Duplan* court. The

control group test provides inadequate protection for employee communications in that it seeks to limit the availability of the attorney-client privilege in an artificial manner. Because attorneys may have to communicate with a number of employees in a corporation in order to render proper advice, particularly when antitrust and patent issues are involved, if those communications are never privileged, then the well-established purpose of the privilege—to promote full and frank discussion—would be frustrated. On the other hand, the privilege must be structured so that a large "zone of silence" around corporate affairs is not created by allowing corporations to insulate all their activities by discussing them with legal advisers.[17]

The approach taken by this Court achieves, it is hoped, a proper balance. This approach, rather than relying on the corporate status of the employee, looks instead at the subject matter of the communication and the context in which the communication was made. By thus limiting the privilege to those communications which were believed to be relevant to a particular legal problem, it attempts to take into account corporate ways of conducting business while still "strik[ing] a balance between the privilege's goal of promoting freedom of consultation and full disclosure between an attorney and a seeker of legal services, and the law's need for relevant evidence."[18]

B. *The Attorney-Client Privilege Only Protects Communications That Were Made By The Client With The Intention Of Confidentiality And Those That Were Made By The Attorney That Might Tend To Reveal A Confidential Client Communication.*

█ In Report 9, the Master, after recommending the adoption of the *Harper &*

---

17. *See* Simon, *The Attorney-Client Privilege as Applied to Corporations,* 65 Yale L.J. 953, 955–56 (1956).

18. 2 *Weinstein's Evidence,* ¶ 503(b)[04] at 503–44 (1975). The Court's approach finds support

not only from *Duplan* and Weinstein, but also from the recent *en banc* decision of the Eighth Circuit in *Diversified Industries v. Meredith,* 572 F.2d 596 (8th Cir. 1978). *See* n.8 *supra.*

*Row* test [19] and finding that all of the documents in question met that test, nevertheless concluded that only one of the documents should be held privileged. His reasons have engendered a dispute between the parties on the issue of what the term "confidential communication" means.

In recommending against the privilege in Report 9, the Master reasoned that a document should not be considered privileged if, for example, "the documents by and large simply do not reflect information confidential to Beecham;" "the document was intended to be made known to the other party or parties;" or, the substance of the document is "to be communicated to another party."

Beecham asserts that the Master has misconstrued the requirement of confidentiality, as set forth by Judge Wyzanski in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357, 358–59, (D.Mass.1950), and by Dean Wigmore in 8 Wigmore *Evidence*, § 2292 at 554 (McNaughton rev. 1961). Beecham maintains that there is no requirement that the information or facts in and of themselves be confidential (known only to the client); rather, it contends that the only criterion is that the communication be made in confidence. In response, the plaintiffs assert that the information must be confidential.

After consideration of the briefs and cited authorities, developments in the law since the Report was issued, and the purposes of the attorney-client privilege, the Court finds that the communication need not be of confidential information for the privilege to apply. Instead, the Court holds that a *client* communication is privileged if it was made with the *intention of confidentiality, see, City of Philadelphia v. Westinghouse Electric Corp.*, 205 F.Supp. 830, 831 (E.D.Pa.1962); *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 37 (D.Md.1974), and an *attorney* communication is privileged if it would directly or indirectly reveal confidential communications by the client and if it was considered confidential by the client.[20] *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977); *Herbert v. Lando*, 73 F.R.D. 387, 398–99 (S.D.N.Y.1977).

The plaintiffs have cited two cases as supporting a requirement that the *information* be confidential, *Wirtz v. Fowler*, 372 F.2d 315 (5th Cir. 1966), and *United States v. International Business Machines Corp.*, 66 F.R.D. 206 (S.D.N.Y.1974), and a third case, *Community Savings & Loan Ass'n v. Federal Home Loan Bank Board*, 68 F.R.D. 378 (E.D.Wis.1975), has been recently cited as requiring that the communication from the attorney to the client must be based on confidential information provided by the client in order to be privileged.[21] In fact,

**19.** This Court, for the reasons set forth in part III A, *supra*, of this Opinion, has adopted a legal standard different from the *Harper & Row* test.

**20.** Strictly speaking, the privilege applies only to communications made by the client to the lawyer, but in practice it is generally impossible to separate those communications from the ones made by the attorney to the client, particularly when the attorney communications will reveal the substance of the ones made by the client that are privileged. *See* 8 Wigmore, *Evidence*, § 2320 at 628–29 (McNaughton rev. 1961); E. Morgan, *Basic Problems of Evidence* 111 (1961); *Natta v. Hogan*, 392 F.2d 686, 693 (10th Cir. 1968). Therefore, the privilege "normally extends both to the substance of the client's communication as well as the attorney's advice in response thereto." [citation omitted]. *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977).

**21.** *Mead Data Central, Inc. v. United States Department of Air Force*, 184 U.S.App.D.C. 350, 362 n.26, 566 F.2d 242, 254 n.26 (1977). In *Mead Data*, the court was examining the applicability of the attorney-client privilege to an exemption five claim under the Freedom of Information Act [FOIA]. After stating that the privilege does have "a proper role to play in exemption five cases," id., 184 U.S.App.D.C. at 360, 566 F.2d at 252, the court said that for the privilege to apply "[i]t must also be demonstrated that the information is confidential." Id., 184 U.S.App.D.C. at 361, 566 F.2d at 253. However, the court made clear that it was addressing the attorney-client privilege's role in exemption five cases and not in any other context. In response to Judge McGowan's position in his dissent that the key point was whether the "*communication* . . . was confidential," *Id.*, 184 U.S.App.D.C. at 372, 566 F.2d at 264, (emphasis added), the majority replied "our dissenting brother structures his concern relative to the attorney-client in sound

none of these cases offers strong support for such a requirement. The district court in *Community Savings & Loan* based its denial of the privilege on the fact that the communication by the attorney was not in response to a confidential communication by the client. The information the client sent to the General Counsel's office consisted almost entirely of material which was in the public record, so that disclosing the General Counsel's advice would not reveal any *confidential* communication made by the client. In *Wirtz*, the court, relying on McCormick, *Evidence* § 91, at 188–89 (1954) and 8 Wigmore, *Evidence* § 2313, at 609 (McNaughton rev. 1961), stated that by weight of authority the attorney-client privilege "protects the disclosure of confidential information only." 372 F.2d at 332. However, neither authority speaks of confidential *information*; rather, both state that the *communication* must be made with the intention of confidentiality. Similarly, while the *IBM* court twice noted that the attorney-client privilege protects confidential information, it cited for support three cases, *United Shoe, supra; Colton v. United States*, 306 F.2d 633 (2d Cir. 1962), *cert. denied* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); and *United States v. Silverman*, 430 F.2d 106 (2d Cir.), *modified* 439 F.2d 1198 (2d Cir. 1970), *cert. denied* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), all of which refer to confidential communications rather than confidential information and all of which appear to support the

position that it is not necessary that the information be confidential for the privilege to apply.[22]

In these as in many other cases, the distinction between the information and the communication is not articulated clearly. Because the purpose of the attorney-client privilege is to promote a free and open discussion between the client and the attorney, the privilege should protect only the client's communications to the attorney (and so much of the attorney's communications to the client that might tend to reveal a client communication) and not facts or other *information* contained in the communication.[23] Therefore, in order for the privilege to apply the client's *communications* must be made with the intention of confidentiality and the attorney's communications must be ones that were considered confidential by the client and would indirectly or directly reveal a confidential client communication. It is not necessary that the *information* be confidential. Under this standard, information the attorney learned from a client would be privileged if it was learned in a confidential client communication. Similarly, the attorney may be questioned about information obtained from public documents or other public sources because it was learned *outside* of the confidential attorney-client relationship (not because there is a requirement that the information be confidential).[24] The *communica-*

generalities which unfortunately disregard the basic fact that this case arises under the Freedom of Information Act." *Id.*, 184 U.S.App. D.C. at 363 n.28, 566 F.2d at 255 n.28. The court then proceeded to mention some of the policy considerations particular to a FOIA case, that would not be applicable to an antitrust case such as the case at bar, such as the overall congressional intent of ensuring comprehensive public access to government records.

22. For example, in *Colton, supra,* at 637, the court said "the privilege extends essentially only to the substance of matters communicated to an attorney in professional confidence."

23. Note, *The Attorney and His Client's Privileges,* 74 Yale L.J. 525, 546–47 (1915) ("If a fact is communicated orally by a client to his attorney it continues to be accessible to examination. Although neither attorney nor client may be

questioned regarding the privileged communication per se, the client may always be questioned on the facts behind the communication. For example, the client may not be asked the question, "What did you tell your attorney about the amount claimed as a business expense?" But he may be asked the question, "Did you spend the amount claimed as a business expense for meals or for travel?"). *See* 2 *Weinstein's Evidence,* ¶¶ 503(a)(4)–(b)[03] (1975).

Even though the attorney-client privilege may not apply, protection may be available under the fourth or fifth amendments. *See In re Grand Jury Subpoena Duces Tecum,* 391 F.Supp. 1029, 1032–33 (S.D.N.Y.1975).

24. The Master, in Report 10 entitled "Master's Report on Supplemental Rule 37 Motion against Beecham Defendants," dated August 15, 1975, briefly readdressed the confidential

*tion* of this publicly-obtained information, however, should be privileged to the extent that the communication was treated as confidential by the client and would tend to reveal a confidential communication of the client. *Matter of Fischel, supra,* at 211–12. The determinative factor in deciding which communications are privileged is the intent of the client, for if he intends to, or permits his attorney to, disclose the communication to others, there can be no confidentiality.[25] *United States v. McDonald,* 313 F.2d 832, 835 (2d Cir. 1963). Intent and confidentiality will depend on the circumstances of the particular case and may require a document-by-document determination in which the substance of the document may be the only objective indicator of the client's intention.

Thus, to the extent that the Master conditioned his recommendations on the requirement that a communication be of confidential facts known only to the client, those recommendations must be rejected and the Court will apply its test to these documents. However, the Court does not interpret the Master's statements as indicating that he used as a criterion for all documents that they contain confidential information. Instead, it appears to the Court that the Master, for the most part, sought to prevent the application of the privilege to those documents where it appeared that the intention of confidentiality was lacking.

 Beecham also argues that the Master erred in assuming that a document was not intended to be held confidential where it contained evidence that the client was later to confer with others, outside the corporation, concerning the matter. Beecham maintains that there is a difference between an intention to discuss the facts underlying a communication with others and an intention to disclose the actual communication to or from the attorney, the former being insufficient in itself to waive the privilege. While there may be a difference, the intention to disclose does undermine a later assertion that the communication was intended to be confidential. Thus, where a business proposal is sent to counsel for legal advice, with an accompanying expressed intent to disclose the proposal to a third party, the communication will not be deemed to be made in confidence and thus will not be privileged. *United States v. Tellier,* 255 F.2d 441 (2d Cir.), *cert. denied* 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62 (1958); *Hiltpold v. Stern,* 82 A.2d 123 (D.C. Mun.Ct.App.1951). In general, the intention of the client will be a question of fact, and must be reviewed as such, and the burden is on the party asserting the privilege to establish the factual predicate for the claim. *United States v. Tratner,* 511 F.2d 248, 251 (7th Cir. 1975); *Bouschor v. United States,* 316 F.2d 451, 456 (8th Cir. 1963).

In this Court's view, the most appropriate resolution of the conflicting objectives of encouraging individuals to speak freely to their attorneys and of limiting the amount of relevant material that is not subject to discovery is to require only that the *communication* be confidential. If an attorney-client communication could be discovered if it contained information known to others, then it would be the rare communication that would be protected and, in turn, it would be the rare client who would freely communicate to an attorney. *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86

information-confidential communication dispute he ruled on in Report 9. In Report 10, he stated that he believed "there is adequate warrant, particularly where patents are concerned, for requiring that there be some element of confidentiality as to the information itself." Report at 10. To the extent the information was learned from public documents, this Court agrees with the Master that the *information* is not privileged. A confidential *communication* of public information, however, may still be privileged.

**25.** For example, communications made by the client are not protected if made in the presence of third parties or under other circumstances in which they were not considered confidential by the client. Similarly, responses by the attorney, if they would not tend to reveal anything confidential about the attorney-client relationship or if the responses were not treated as confidential by the client, would not be protected.

(1973). *See Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

C. *The Availability Of The Attorney-Client Privilege For Patent Agent Communications Is Governed By The Law Of The Country To Which The Patent Activities Relate; For Communications Relating To United States Patent Activities, The Privilege Is Available Only If The Agent Is Registered With The United States Patent Office.*

▉ The third major issue that has been raised by Beecham is the Master's decision that the attorney-client privilege does not apply to communications between a patent agent and a client. Beecham objects in particular to the denial of the privilege to its Chartered Patent Agent, Mr. Ronald Smither, who, it alleges, has the same training and experience as a patent attorney and provides identical legal services. However, the Master held in Reports IA and IB:

> For the privilege to attach, not only must the client's advisor be acting as an attorney, but he must *be* an attorney, admitted to the bar. Regardless of his training and function and the nature of the advice he renders, Mr. Smither is not a member of the bar of any court.

Report IA at 3 (emphasis in original). The Master reaffirmed this view in his rulings on other documents in Report 10. At issue are a number of documents containing communications by Mr. Smither and other foreign patent agents relating to patent activities both in the United States and other countries.

After consideration of the Master's reports, and the points and authorities of counsel, the Court concludes that the Master's rulings must be modified, and that the attorney-client privilege will be available: (1) for communications relating to patent activities in the United States, only if the patent agent is registered with the United States Patent Office (Patent Office) pursuant to 37 C.F.R. § 1.341(c) or § 1.341(e); and

(2) for communications relating to patent activities in another country, only if the other country specifically grants such a privilege. Because the communications involve patent activities in the United States as well as in England and other countries, the Court, in reaching its conclusion, has had to determine both which country's patent agent privilege rule should apply to a particular communication and what the country's privilege rule is.

*(1) The Determination of the Appropriate Patent Agent Privilege Rule To Apply to Communications Relating to Patent Activities in Different Countries.*

▉ Because the communications involving patent agents relate to patent activities in different countries, the Court must determine which patent agent privilege rule governs for each particular communication. For this determination, the Court will follow the well-accepted rule that while no law has of its own force any effect outside the territory of the state or nation from which its authority is derived, foreign laws may, within certain limits, be given effect. *See Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 64 S.Ct. 208, 88 L.Ed. 149 (1943); *Argyll Shipping Co. v. Hanover Insurance Co.*, 297 F.Supp. 125 (S.D.N.Y. 1968). Comity, however, will not be extended to foreign law if it is contrary to the public policy of the forum. *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1169, 184 U.S.P.Q. 775, 778 (D.S.C.1974). Therefore, because the United States has a strong interest in regulating activities that involve its own patent laws, all communications relating to patent activities in the United States will be governed by the American rule. However, the United States has no such strong interest for patent agent communications relating to patent activities in Great Britain, so that deference will be given to the British rule. For communications relating to patent activities in other countries, no privilege will be granted as the defendants have failed to indicate what the applicable privilege is, if indeed any exists.[26]

26. In its briefs, Beecham has stated that it understood the privilege in the other countries

to be similar to the British one. While no evidence has been offered to support this posi-

**(2) The Scope of the Privilege in Great Britain and the United States, for Patent Agent Communications.**

**(a) The British Rule**

The British rule on the attorney-client privilege as it relates to patent agent communications is determined by statute. Enacted on October 25, the Civil Evidence Act of 1968, § 15(1), 12 Halsbury's Statutes of England 927–28 (3d ed. 1969) states:

15. Privilege for certain communications relating to patent proceedings.

(1) This section applies to any communication made for the purpose of any pending or contemplated proceedings under the Patents Act 1949 before the comptroller or the Appeal Tribunal, being either—

(a) a communication between the patent agent of a party to those proceedings and that party or any other person; or

(b) a communication between a party to those proceedings and a person other than his patent agent made for the purpose of obtaining, or in response to a request for, information which that party is seeking for the purpose of submitting it to his patent agent.

For the purposes of this subsection a communication made by or to a person acting—

(i) on behalf of a patent agent; or

(ii) on behalf of a party to any pending or contemplated proceedings, shall be treated as made by or to that patent agent or party, as the case may be.

However, for communications made before the effective date of the Act, no privilege can attach as there was no statutory privilege. The "NOTES" to the statute state that "[c]ommunications with a patent agent have hitherto not been privileged; see *Moseley v. Victoria Rubber Co.* (1886), 55 L.T. 482." *Id.* at 928. Therefore, no patent agent communication, relating to patent activities in Great Britain, made before October 25, 1968, will be privileged. For a communication made after that date, the privilege will apply if it was "made for the purpose of any pending or contemplated proceeding before the comptroller or the Appeal Tribunal." *See* the Civil Evidence Act of 1968, *supra*.

**(b) The American Rule**

Unlike the British Rule, the American rule is not governed by statute and, as the Master's reports and the briefs of the parties indicate, there is a split in the case law. *Compare Joh. A. Benckiser G.m.b.H., Chem. F. v. Hygrade Food Products Corp.*, 253 F.Supp. 999 (D.N.J.1966); *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950); *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 184 U.S. P.Q. 775 (D.S.C.1974); and *Rayette-Faberge, Inc. v. John Oster Manufacturing Co.*, 47 F.R.D. 524 (E.D.Wis.1969), (denying the availability of the privilege to patent agent communications), *with Vernitron Medical Products, Inc. v. Baxter Laboratories, Inc.*, 186 U.S.P.Q. 324 (D.N.J.1975); *Jack Winter, Inc. v. Koratron Company, Inc.*, 54 F.R.D. 44 (N.D.Cal.1971); and *In Re Yarn Processing Patent Litigation*, 177 U.S. P.Q. 514 (S.D.Fla.1973) (making the privilege available equally to patent agent and patent attorney communications).[27] This

---

tion, if the privilege rules were the same, most of the documents would not be privileged as they were written before October 25, 1968, the first date any patent agent communications became privileged in England. In any case, absent a specific showing of privilege, the Court will not restrict discovery.

**27.** While it is now generally accepted that the attorney-client privilege may apply to patent attorney-client communications, *see, e. g., Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 39 (D.Md.1974), and *Natta v. Hogan*, 392 F.2d 686, 691–92 (10th Cir. 1968), some cases decided prior to *Sperry v. Florida*, 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), *see, e. g.,*

*Zenith Radio Corp. v. Radio Corporation of America*, 121 F.Supp. 792 (D.Del.1954), and *Georgia-Pacific Plywood Co. v. United States Plywood Corp.*, 18 F.R.D. 463 (S.D.N.Y.1956), held that the privilege was never available because patent activities were "technical" and "scientific" rather than "legal" so that the patent attorney was not performing legal services as was required in the *United Shoe* test. The following language, although *dictum*, had a significant impact on lower courts who were subsequently faced with the question whether to afford the attorney-client privilege to communications between a client and a patent practitioner:

Court concludes, for the reasons hereinafter stated, that the privilege must be made available to communications involving patent agents, but only for those agents registered with the Patent Office.[28]

In *Sperry v. Florida,* 373 U.S. 379, 83 S.Ct. 1322, 10 L.Ed.2d 428 (1963), the Supreme Court discussed the right of a Florida patent agent, who was not a licensed attorney but was registered as a patent agent with the Patent Office, to give patent advice, prepare patent applications, and perform other patent services. The Court, reversing the Supreme Court of Florida, held that even though the agent was engaging in what amounted to be, under Florida law, the unauthorized practice of law, Florida could not enjoin such activities because to do so would give the state a virtual power of review over the congressional determination, as expressed in the statutes and regulations, that a registered patent agent is qualified to perform certain patent services. The Supreme Court noted that the regulations expressly permitted both agents and attorneys to engage in certain patent activities, and the Supreme Court of Florida could not deny the agent a right he had been granted by Congress.

▆▆▆▆ While the denial of the attorney-client privilege to patent agent communications is different from the refusal to allow a patent agent to engage in any pat-

ent activities at all, imposing such a limitation on patent agent communications would result in significantly unequal treatment of patent agents and patent attorneys. Congress, in creating the Patent Office, has expressly permitted both patent attorneys and patent agents to practice before that office. The registered patent agent is required to have a full and working knowledge of the law of patents[29] and is even regulated by the same standards, including the Code of Professional Responsibility, as are applied to attorneys in all courts.[30] Thus, in appearance and fact, the registered patent agent stands on the same footing as an attorney in proceedings before the Patent Office. Therefore, under the congressional scheme, a client may freely choose between a patent attorney and a registered patent agent for representation in those proceedings. That freedom of selection, protected by the Supreme Court in *Sperry,*[31] would, however, be substantially impaired if as basic a protection as the attorney-client privilege were afforded to communications involving patent attorneys but not to those involving patent agents. As a result, in order not to frustrate this congressional scheme, the attorney-client privilege must be available to communications of registered patent agents.[32]

We do not question the determination that under Florida law the preparation and prosecution of patent applications for others constitutes the practice of law. *Greenough v. Tax Assessors,* 331 U.S. 486, 67 S.Ct. 1400, 91 L.Ed. 1621; *Murdock v. Memphis,* 20 Wall. 590, 22 L.Ed. 429. Such conduct inevitably requires the practitioner to consider and advise his clients as to the patentability of their inventions under the statutory criteria, 35 U.S.C. §§ 101–103, 161, 171, as well as to consider the advisability of relying upon alternative forms of protection which may be available under state law. It also involves his participation in the drafting of the specification and claims of the patent application, 35 U.S.C. § 112, which this Court long ago noted 'constitute[s] one of the most difficult legal instruments to draw with accuracy,' *Topliff v. Topliff,* 145 U.S. 156, 171, 12 S.Ct. 825, 831, 36 L.Ed. 658. And upon rejection of the application, the practitioner may also assist in the preparation of amendments, 37 C.F.R. §§ 1.117–1–126, which frequently requires written argument to establish the pat-

entability of the claimed invention under the applicable rules of law and in light of the prior art. 37 C.F.R. § 1.119.
*Sperry, supra,* 373 U.S. at 383, 83 S.Ct. at 1325. Since this Court agrees that both patent attorneys and patent agents perform legal services, so that the attorney-client privilege does apply in the patent area, the only remaining issue is whether the privilege should be equally available to both groups.

28. *See* 37 C.F.R. § 1.341(c) which describes the requirements for registration for non-foreign patent attorneys and agents, and § 1.341(e) which describes the requirements for foreign patent attorneys and agents.

29. See 37 C.F.R. § 1.341(c).

30. 37 C.F.R. §§ 1.344–1.348.

31. See n.2 *infra.*

32. While undoubtedly there are patent agents who meet all the registration requirements but have not actually registered, the Court finds it necessary to limit the holding to these agents who have registered. First of all, by limiting

Therefore, where a client, in confidence, seeks legal advice from a registered patent agent who is authorized to represent that client in an adversary process that will substantially affect the legal rights of the client, which thereby necessitates a full and free disclosure from the client to the legal representative so that the representation may be effective, the privilege will be available. This Court agrees with the *Vernitron* court that:

> The substance of the function, rather than the label given to the individual registered with the Patent Office, controls the determination here. In the special field of patents, there can be no question that all of the considerations which support the basis for the privilege between a client and a general practitioner handling an automobile accident claim apply with equal force to an inventor or other applicant for a patent and the representative engaged to handle the matter for him, whether he be a "patent attorney" or a "patent agent," so long as he is registered by the Patent Office.

186 U.S.P.Q. at 325.[33]

■ In conclusion, for communications involving British patent activities, no privilege will be available for communications made prior to October 25, 1968, and the Civil Evidence Act will apply to communications made thereafter. For patent agent communications relating to American patent activities, the privilege is only available to those communications involving patent agents who are registered with the Patent Office. Furthermore, while it is necessary, for the privilege to apply, that a patent agent communication satisfy the requirements of whichever country's rule is applicable, it is important to emphasize that the other requirements for the privilege must also be met. Thus, the communica-

the scope of the privilege, the Court encourages discovery, yet still allows, as did the Supreme Court in *Sperry,* the congressional intent in the patent area to be carried out, in this case the intent to have registered agents and attorneys treated equally. Secondly, the limitation ensures that the agents will be subject to professional and ethical standards, and these standards will be set by the Patent Office. Finally,

tion to the patent agent must involve a response that requires knowledge, analysis, or application of patent law to particular information.

## IV. CONCLUSION

As to the preliminary objections raised by Beecham, the Court concludes that the Master's factual recommendations shall constitute findings of fact and that Beecham was not prejudiced by the Master's failure to convene a meeting of the parties, if indeed he was required to convene such a meeting. Therefore, these objections will be overruled. As to Beecham's objections to the Master's rulings on the attorney-client privilege, the Court finds that the Master's conclusions of law must be modified insofar as they are at variance with the Court's conclusions of law as articulated in Part III of this Opinion.

■ In addition, the Court, in its rulings, recognizes that the burden of proof for a claim of privilege is on the party asserting the claim. Therefore, where Beecham was vague in its privilege claim and it was not clear whether certain advice was given by an attorney or a non-attorney, the privilege was denied. When a document contained an opinion of the Patent Department, of which Mr. Smither, a non-lawyer, is in charge, the privilege was denied unless there was an indication that it was an attorney's opinion. The privilege was also denied for documents that were merely referred to attorneys for comment, unless the attorneys were giving primarily legal, rather than business, advice. In determining factual issues, such as whether it was *legal* advice that was being sought, the Court has not relied solely on the affidavits of the defendants, but has also considered the contents of the documents themselves.

the limitation results in a clearly-defined test so that all parties will know beforehand whether the privilege is available.

33. Defendants, while relying heavily on this case, failed to point out that the holding did not apply to all patent agents, but only to those registered with the Patent Office.

The Court's rulings and findings of fact for the documents affected by the Court's conclusions of law are set out in Appendix A [omitted from publication] of the accompanying Order.

In addition, the Court wishes to note the serious and dedicated work of the Master, John D. Lane, Esquire, in this case. He is and has been a distinguished and outstanding member of the Bar of this and other courts of the country for many years, and without his devotion and help in this complex litigation the Court, with its other heavy responsibilities, would have been helpless. He has filled a void in our system and in this case which deserves the applause and gratitude of the Court and the Bar. Thus, the Court salutes and thanks him and remains confident that the lawyers involved in this case will join the Court in so doing, even though, in the exercise of our respective independent judgment, we may not always have agreed with him.

Therefore, except as indicated in this Opinion or in the accompanying Order, including the rulings and findings in Appendix A [omitted from publication], the Court finds the rulings of the Master to be correct, both in fact and in law, and will adopt them.

An Order in accordance with the foregoing will be issued of even date herewith.

