Robert J. MENDENHALL, et al., Plaintiffs,

v.

BARBER–GREENE COMPANY, Defendant.

No. 80 C 6747.

United States District Court, N. D. Illinois, E. D.

Jan. 20, 1982.

Jerry J. Dunlap, Gary Peterson, Dunlap & Codding, Oklahoma City, Okl., for plaintiffs.

Clarence J. Fleming, McDougall, Hersh & Scott, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

In this patent infringement action defendant Barber-Greene Company ("Barber-Greene") seeks an order under Fed.R.Civ.P. ("Rule") 37(a) requiring production of four letters in the possession of plaintiff Robert Mendenhall ("Mendenhall") or his lawyer Jerry R. Seiler ("Seiler").[1] Its motion poses questions whether:

(1) three communications from Seiler on Mendenhall's behalf to foreign patent agents (not themselves lawyers) processing Mendenhall's foreign patent applications are privileged; and

**1.** Co-plaintiff CMI Corporation is Mendenhall's exclusive licensee of the patents in suit.

**2.** That happened August 24, 1981 when Seiler produced to Barber-Greene's patent lawyer Clarence Fleming ("Fleming") all the patent files (domestic and foreign) Seiler had listing Mendenhall as the applicant. That took place in Seiler's law office in Las Vegas. When Fleming later requested copies of the four letters, Mendenhall's trial counsel Jerry Dunlap

(2) as to all four letters, whether Mendenhall has "waived" any applicable attorney-client privilege by Seiler's inadvertent production of the letters to Barber-Greene's counsel for a brief period of time.[2]

For the reasons stated in this memorandum opinion and order, Barber-Greene's motion is denied.

All four letters were written by Seiler:

(1) to N. M. Wilson, a non-lawyer patent agent, regarding a British patent application;

(2) and (3) to Smart & Biggar, non-lawyer patent agents, as to a Canadian patent application;[3] and

(4) to Dunlap, who *is* a lawyer and Mendenhall's lead counsel in this litigation (though the letter was written before this action was filed).

Only the first three thus present the foreign patent agent problem.

■ That issue—the extent if any to which the privilege exists in communications with that class of non-lawyer—has been considered by courts in varying contexts with varying results. Three approaches are discernible in the existing cases:

(1) Because patent agents are not themselves lawyers, the privilege does not apply to any communications between lawyers and patent agents, foreign or domestic. *See, e.g., Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26, 40 (D.Md.1974); *Rayette-Faberge, Inc. v. John Oster Mfg. Co.*, 47 F.R.D. 524, 526–27 (E.D.Wis.1969); *Joh. A. Benckiser GmbH Chemische Fabrik v. Hygrade Food Products Corp.*, 253 F.Supp. 999 (D.N.J.1966). *Contra, In re Ampicillin Antitrust Litigation*, 81 F.R.D. 377, 392–93

("Dunlap") refused on attorney-client privilege grounds. This motion followed.

**3.** Mendenhall's briefing twice refers to these letters as between Seiler and a "Canadian *law firm*." Because Mendenhall does not assert a privilege on that ground, this opinion assumes that the Canadian "law firm" of Smart & Biggar is in fact a firm of non-lawyer patent agents.

(D.D.C.1978), and cases cited therein. Indeed, this reading of *Rayette-Faberge* and *Benckiser* may go too far, for each appears to involve lawyers communicating with *United States* patent agents about applications for *United States* patents. Those cases are thus not directly in point for the current situation: communications with *foreign* patent agents as to applications for *foreign* patents.[4]

(2) There is a privilege protecting communications between a lawyer and a foreign patent agent only if the communications relate to a foreign application and the law under which the patent would be issued grants a privilege to communications between clients and non-lawyer patent agents. This rule, which as a matter of comity looks to the law of the foreign country, has been embraced in such cases as *Mead Digital Systems, Inc. v. A. B. Dick & Co.*, 89 F.R.D. 318, 320–21 (S.D.Ohio 1980); *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 377, 391–94 (D.D.C.1978); and *Duplan Corp. v. Deering Milliken, Inc.*, 397 F.Supp. 1146, 1169–70 (D.S.C.1974).

(3) *All* communications between lawyers and foreign patent agents assisting them with patent applications are privileged. *See Jack Winter, Inc. v. Koratron Co.*, 54 F.R.D. 44, 48; *see also* 2 Weinstein's Evidence ¶ 503(a)(3)[01] at 503–26 and 27 (1981).

On analysis the first approach seems unduly formalistic (it applies labels rather than reasoning), while the second and third need some leavening in functional terms. Where for example the United States lawyer does nothing more than transmit information from the client to the foreign agent, such communications should not be protected unless the foreign country would make privileged like communications directly between the client and the patent agent.[5] In essence the lawyer is only a conduit for the transmission, and such use as a waystation or repository should not confer privileged status just because that function is being performed by a lawyer.

By parity of reasoning, the privilege should not extend to the situation in which the foreign patent agent occupies the conduit role—where he is employed only because the foreign country somehow makes his services necessary to the United States lawyer.[6] In that case the lawyer's use of an intermediary to transmit information to the foreign patent office should likewise not alter the outcome. So if direct communications between a United States lawyer and a foreign patent office are publicly available and thus *not* privileged on any basis,[7] the same result should obtain if the transmittal goes via the patent agent. *See Illinois Tool Works v. KL Spring & Stamping Corp.*, 207 USPQ 806, 808 (N.D.Ill.1980).

For purposes of the preceding paragraph it makes no difference that the foreign country may grant a privilege to communi-

---

4. This is a meaningful difference. In the United States there is no inhibition against the lawyer's direct handling of the application with the United States Patent Office without involving a patent agent. Unless the patent agent is really acting as the agent of the lawyer in much the same sense as any immediate subordinate (see 2 Weinstein's Evidence ¶ 503(a)(3)[01] at 503–26 and 27 (1981)), the communication to the agent could be viewed just like one to any other outside party: non-privileged. This Court expresses no opinion as to whether that view or the *Ampicillin* position has the better of the argument. In any event, however, introduction of the foreign elements creates a whole new set of variables.

5. In this case the parties do not quarrel as to the state of British or Canadian law: Both countries appear to recognize the attorney-client privilege for communications with a pat-

ent agent. Civil Evidence Act of 1968, § 15(1) (Great Britain); *cf. IBM Canada Ltd. v. Xerox of Canada Ltd.*, 32 Can.Patent L.Rep. 205 (Fed. Ct.App.1977) (Canada).

6. This would be true for example where the foreign agent must be used either because it would be prohibitively expensive for the United States patent lawyer to handle the foreign application directly or because restrictive licensing by the foreign patent office prevents such representation.

7. Of course a different problem is presented where communication with the foreign patent office is itself confidential. In that case, the information—even if "routine" and handled by a foreign agent—would *not* be discoverable irrespective of the attorney-client privilege.

cations between a client and the non-lawyer patent agent. This is so because the communication is not really between client and agent but rather between United States lawyer and foreign patent office, so the agent's status is irrelevant.

All the analysis shifts dramatically if the communication between lawyer and foreign agent is "substantive"—if it is not simply meant to be passed along to the foreign patent office as part of the client's application. In that event there are two possibilities:

(1) If the foreign patent agent is primarily a functionary, with the real lawyering being done by the United States lawyer, the communication is like that between a lawyer and any non-lawyer who serves under the lawyer's supervision. Privilege normally covers communications between a lawyer and the law clerks in his office or the investigators or consultants whom he must retain to represent a client adequately. Weinstein's Evidence ¶ 503(a)(3)[01] at 503–24 (1981). It therefore makes no difference whether the patent agent himself is generally covered by a privilege, any more than is required of an investigator under parallel circumstances.

(2) If the patent agent is also engaged in the substantive lawyering process however (because of knowledge of the foreign law), the communications between United States lawyer and foreign patent agent are between two professionals. If that is in fact the situation presented by the present case, each is treated by his own country as a subject of the privilege. Hence the posture is no different from what would obtain if co-counsel in the United States were to correspond with each other on substantive legal matters: clearly privileged.

In sum, then, the situation is this:

(1) Even if Seiler were simply a conduit between Mendenhall and the foreign patent agents, the three letters would be privileged because the foreign countries confer that status on the patent agents. Only one conceivable exception could ap-

ply: the wholly unrealistic hypothesis that *both* Seiler and the patent agent were performing a mere conveyor belt function between Mendenhall and the foreign patent office. There has been no hint that such was the case (and it will be recalled that Fleming has already seen the documents).

(2) If the Seiler letters reflected any substantive aspects rather than a mere conduit role, the three letters would be privileged under one of the alternatives discussed in the paragraphs immediately preceding these summary paragraphs.

(3) Only if the foreign patent agents were being used as a transmitting station to the foreign patent office, and if direct communications to that office were public, would the three letters be unprivileged. Once again no suggestion of that nature has been made by Barber-Greene, though its lawyer has seen the letters. Barber-Greene's motion must fail as to the first three letters.

■ As for the fourth letter, between the two Mendenhall lawyers, Barber-Greene's argument is most puzzling. Surely the mere fact that the letter preceded this litigation is irrelevant. Barber-Greene's characterization of the letter as "correspondence... between attorneys for two separate clients" is hardly self-explanatory, and Fleming's supporting affidavit does not help. Thus the motion must be denied for failure of an adequate showing in support.

■ It remains then to treat with Barber-Greene's final argument, in which it claims that the August 24, 1981 disclosure of the four letters to its counsel waived any privilege that might otherwise apply. Although the disclosure was assertedly accidental, there is authority for finding such a waiver. *W. R. Grace & Co. v. Pullman, Inc.*, 446 F.Supp. 771, 775 (W.D.Okl.1976); *Underwater Storage, Inc. v. United States Rubber Co.*, 314 F.Supp. 546, 549 (D.D.C. 1970). But the better-reasoned rule is that mere inadvertent production does not waive the privilege. *Dunn Chemical Co. v. Sybron Corp.*, 1975–2 Trade Cas. ¶ 60,561 at 67,463 (S.D.N.Y.1975); *Connecticut Mutual Life Ins. Co. v. Shields*, 18 F.R.D. 448, 451 (S.D.

N.Y.1955); *see also Transamerica Computer Co. v. IBM Corp.*, 573 F.2d 646, 653 (9th Cir. 1978) (Kennedy, J., concurring); *Permian Corp. v. United States*, 665 F.2d 1214 at 1220 n. 11 (D.C.Cir.1981).[8]

We are taught from first year law school that waiver imports the "intentional relinquishment or abandonment of a known right."[9] Inadvertent production is the antithesis of that concept. In response to a production request encompassing all Medenhall files, Seiler provided Barber-Greene with 28 complete files. When he pored over the files (as was his right) Fleming found the four letters now at issue. Mendenhall's counsel now says their delivery was unintended.

Mendenhall's lawyer (not trial counsel) might well have been negligent in failing to cull the files of the letters before turning over the files. But if we are serious about the attorney-client privilege and its relation to the *client's* welfare, we should require more than such negligence by *counsel* before the client can be deemed to have given up the privilege. See *Dunn Chemical* at 67,463. No waiver will be found here.

### Conclusion

Neither of the problems posed by Barber-Greene's motion admits of an easy answer. On balance however the motion for production of the four letters is denied in its entirety.

**8.** Neither party has cited, but the Court has considered, Judge Leighton's very recent opinion in *Suburban Sew 'n Sweep, Inc. v. Swiss-Bernina, Inc.*, 91 F.R.D. 254, 257–60 (N.D.Ill. 1981). Judge Leighton held the attorney-client privilege lost where the client threw copies of the privileged communications out as trash in the company dumpster from which the opposing party retrieved them. With all respect this Court does not concur in Judge Leighton's conclusion that the "case presents a very close question," *id.* at 260. Instead this Court subscribes to the approach exemplified by Rule 503(a)(4) of the initially proposed Federal Rules of Evidence as approved by the Supreme Court (emphasis added):

A communication is "confidential" if not *intended* to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably

necessary for the transmission of the communication.

That Rule rejected the old Wigmore strict responsibility doctrine in favor of an "intent" test. Judge Leighton accurately describes the Rule, though not ultimately adopted by Congress, as "providing valuable standards for the courts." For this Court the Wigmore doctrine is atavistic, generating (in much the same way as a flawed pleading in the era of common law pleading) harsh results out of all proportion to the mistake of inadvertent disclosure.

**9.** Just a week ago our Court of Appeals repeated this locution. *United States ex rel. Ross v. Franzen*, 668 F.2d 933 at 941, (1982), quoting from *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Though the Court spoke in *Ross* of the waiver of constitutional rights, the same concept applies to waivers generally. Black's Law Dictionary 1417 (5th ed. 1979).