FARM CREDIT BANK OF ST. PAUL,
Plaintiff and Appellee,

v.

William G. HUETHER, a/k/a William
Huether and Patricia Huether,
Defendants and Appellants,

and

Santa Fe Energy Company, a corporation; Corbin J. Robertson; and the
United States of America, Defendants.

Civ. No. 890163.

Supreme Court of North Dakota.

April 12, 1990.

Lundberg, Nodland, Schulz, Lervick, Thar-aldson & Dickson, P.C., Bismarck, for defendants and appellants; argued by Thomas A. Dickson.

Bair, Brown & Kautzmann, Mandan, for plaintiff and appellee; argued by Malcolm H. Brown.

ERICKSTAD, Chief Justice.

William and Patricia Huether appeal from a district court judgment granting the Farm Credit Bank of St. Paul (FCB) foreclosure of its mortgage on land owned by the Huethers. We affirm.

On January 15, 1979, the Huethers executed a promissory note for $155,000 secured by a mortgage on real property in Hettinger County. The mortgage and loan were reamortized on June 6, 1984. A Summons and Complaint were filed on July 15, 1986, the complaint alleging default

through the failure to pay an installment due January 1, 1986. A trial was held on January 3, 1989. Judgment of foreclosure was entered on March 16, 1989.[1] On May 11, 1989, the Huethers appealed to this Court from the judgment of foreclosure.[2]

On appeal, the Huethers assert the following:

### I.

"The Complaint should have been dismissed for failure to comply with the requirements of Chapter 32–19 NDCC."

### II.

"Farm Credit Bank failed to comply with the Agricultural Credit Act of 1985."

### III.

"Farm Credit Bank failed to comply with the Agricultural Credit Act of 1987."

### I.

In order to bring an action in district court for foreclosure of a mortgage upon real property, the plaintiff must comply with the provisions of chapter 32–19 of the North Dakota Century Code. Section 32–19–01, N.D.C.C. Section 32–19–20, N.D.C.C., provides that a written notice before foreclosure must be served upon the title owner of record of the real estate described in the mortgage before an action to foreclose the mortgage may be commenced. The Notice Before Foreclosure and an Affidavit of Service by Mail stating that such notice had been mailed to the appellants were filed with the district court on July 15, 1986. The post-office registry return receipts, bearing the purported signature of Patricia Huether were also filed with the district court prior to trial. Trial counsel for FCB failed to offer the Notice Before Foreclosure into evidence during the course of the trial.

In a post-trial memorandum, the Huethers asserted that FCB failed to prove its prima facie case because it failed to prove that proper notice was given to the mortgagor pursuant to section 32–19–20, N.D.C.C. FCB responded by requesting the trial court to accept the Notice Before Foreclosure, the Affidavit of Service By Mail, and the return receipts, all of which had been filed with the clerk of the district court prior to trial, as a late filing to complete the record. The trial court admitted the documents on the grounds that it could take judicial notice of the clerk's file pursuant to Rule 201, N.D.R.Ev.

On appeal the Huethers contend that, in order to meet the statutory requirement of service, it is incumbent upon the mortgagee to prove that the statutory notice was received by the mortgagor.

Section 32–19–25, N.D.C.C., provides that service of the notice before foreclosure may be made "in the manner provided by law for the service of a summons in a civil action." Service of a summons in a civil action must be made pursuant to Rule 4 of the North Dakota Rules of Civil Procedure. Rule 4(h)(4), N.D.R.Civ.P., provides:

"Proof of service of the summons and of the complaint or notice, if any, accompanying the same or of other process, must be made as follows:

\*    \*    \*    \*    \*    \*

(4) in any other case of service by mailing resulting in delivery in accordance with paragraph (2) or (3) of subdivision (d) of this rule, by an affidavit of the mailing of a copy of the summons and complaint or other process, with return receipt attached."

Rule 4(d)(2)(A)(iv) provides:

"Personal service of process within the state must be made as follows:

---

**1.** The defendants Santa Fe Energy Company and the United States of America have stipulated that their interests are inferior and subordinate to the mortgage of FCB. The defendant Corbin J. Robertson made no appearance and was judged in default.

**2.** On May 12, 1989, the Huether family farm was sold on the courthouse steps of Hettinger County. The sale was confirmed by order of the Honorable Donald L. Jorgensen on June 1, 1989. On July 14, 1989, the Huethers negotiated a buy-out of all liens held by the Farmers Home Administration. The Huethers have until May 12, 1990, to redeem their farm.

(A) upon an individual 14 or more years of age by . . . (iv) any form of mail addressed to the person to be served and requiring a signed receipt and resulting in delivery to that person."

These rules use the language "resulting in delivery." The relevant statutory sections in conjunction with a foreclosure, however, do not use those words. Section 32–19–27, N.D.C.C., provides that: "Proof of service of notice before foreclosure may be made by the return of a sheriff or other officer, or by affidavit of the person making personal service or mailing such notice." While section 32–19–26, N.D.C.C., provides that "service of the notice before foreclosure shall be sufficient if it actually was received by the title owner of record or by the administrator or executor of his estate," it goes on to read:

"A United States post-office registry return receipt showing that the envelope containing the notice has been delivered to the title owner of record or to the administrator or executor of his estate, or to the agent of either, shall be prima facie evidence that such owner or his administrator or executor received the same."

In analyzing the explanatory note of Rule 4, N.D.R.Civ.P., and the table of statutes superseded in the North Dakota Rules of Civil Procedure, we note that neither section 32–19–26 nor section 32–19–27 are listed as affected or superseded. Assuming, for the sake of argument only, that this is a purely procedural matter and not a substantive matter, and thus that the Rule prevails over the statutes, and thus that there must be proof of "delivery," we conclude that there is prima facie proof of delivery from the signed receipts and the affidavit of mailing.

The Huethers concede that the trial court may take judicial notice of the documents in the court record and files, but assert that the authentication of Patricia Huether's signature on the post-office registry return receipts is required before the trial court may take judicial notice of them.

■ Generally, before documentary evidence is admissible it must be authenticat-

ed. *R & D Amusement Corp. v. Christianson,* 392 N.W.2d 385, 386 (N.D.1986). Authentication is the process of establishing the relevancy of a document by connecting it with a person, place, or thing. *State v. Haugen,* 392 N.W.2d 799, 801 (N.D.1986); *Farmers Union Oil Co. of Dickinson v. Wood,* 301 N.W.2d 129, 136 (N.D.1980).

■ Rule 901(a), N.D.R.Ev., provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." In *R & D Amusement Corp.,* we said:

"N.D.R.Ev. 901(a) treats questions of authentication as matters of conditional relevance to be determined according to N.D.R.Ev. 104(b). Explanatory Note to N.D.R.Ev. 901, N.D. Court Rules 1986 Desk Copy. The relevancy of a document is conditioned upon its authenticity. Thus, when a document is offered, a judge must make a preliminary determination whether sufficient proof has been introduced to allow a reasonable fact finder to conclude the document is authentic, *i.e.,* it is what its proponent claims it to be. If so, the judge must admit the evidence and the question of its weight and prosecutive force is one for the jury. N.D.R.Ev. 104(b); *State v. Vetsch,* 368 N.W.2d 547 (N.D.1985); *see generally* 11 Moore's Fed.Prac. § 901.03; 5 Weinstein's Evidence ¶ 901(a)[01].

"The question whether evidence should be excluded for lack of authentication is primarily within the sound discretion of the trial court. *See State v. Schneider,* 389 N.W.2d 604 (N.D.1986). An abuse of discretion implies an unreasonable, arbitrary, or unconscionable attitude on the part of the trial court. *Lange v. Cusey,* 379 N.W.2d 775 (N.D.1985)."

*R & D Amusement Corp., supra,* at 386.

In *R & D Amusement Corp.,* R & D's action against Gem Investment Group (Gem) was based upon a memorandum agreement by which the Rose Patterson Estate purportedly agreed to reimburse R

& D for a proportionate share of R & D's costs in installing air conditioning in a theatre housed in a building owned by Rose Patterson. The trial court received the memorandum agreement in evidence. Gem maintained that this was reversible error in that the memorandum agreement was not authenticated because there was insufficient evidence to prove that the signature on it was of the person it was purported to be. The entire testimony concerning the memorandum agreement was that of an employee of R & D who simply testified that the original agreement was in R & D's corporate records. R & D offered no additional evidence that the signature was in fact authentic. In concluding that the trial court's receipt in evidence of the memorandum agreement was reversible error, we said:

> "The only evidence to authenticate the memorandum agreement in any fashion was circumstantial. R & D installed the air conditioning at a time and cost consistent with the terms of the memorandum agreement. Based upon the evidence, the only argument we can conjure up to support the trial court's decision to admit the document rests on speculation and inferences drawn from that speculation, to-wit: R & D would not have installed the air conditioning if the memorandum agreement were not binding; the memorandum agreement was binding only if signed by Thieren; therefore, because R & D installed the air conditioning, it must be Thieren's signature on the memorandum agreement. This argument is hopelessly circular.

> "There must be evidence of foundation sufficient to allow a reasonable fact finder to conclude that it was Thieren's signature on the memorandum agreement. If no such foundation is established the document is inadmissible. *See Osborn v. Empire Life Ins. Co. of America,* 342 So.2d 763 (Ala.1977); *DePearl Corp. v. Com.,* 65 Pa.Cmwlth. 140, 442 A.2d 1 (1982). Here R & D failed to meet the threshold. Consequently, we hold that the trial court abused its discretion by concluding that the memorandum agree-

ment was adequately authenticated and thus admissible."
*R & D Amusement Corp., supra,* at 387.

*R & D Amusement Corp.,* is distinguishable from the case at hand. In *R & D,* the disputed document was the crux of the lawsuit. The validity of the disputed memorandum agreement determined whether or not Gem had a financial obligation to R & D. While notice of the foreclosure action is an essential element in the case at hand, it · is a procedural requirement which does not determine the merits of the relationship between the parties. Thus, there is a greater requirement for authenticity of a signature as to a document which is the crux of the lawsuit than there is for a signature on a post-office registry return receipt used to determine whether or not a party was properly served. The Huethers have referred us to no service of process case requiring authentication of the signature on a postal service receipt, and we have found none.

Also, while the circumstantial evidence in *R & D* was circular and unhelpful, it is uniformly recognized that a document may be authenticated by circumstantial evidence, such as the events preceding, surrounding, and following the transmission of a writing. *State v. Haugen, supra,* 392 N.W.2d at 802. In the case at hand, there is sufficient circumstantial evidence to authenticate the signed receipts: the affidavit of mailing, the return of the receipts, and the lack of denial by William Huether of the receipt of notices and correspondence from FCB until the post-trial memorandum.

■ The trial court is also at liberty to take judicial notice of an adjudicative fact which is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. Rule 201, N.D.R.Ev.

Therefore, we find that the trial court did not abuse its discretion in accepting the evidence of proof of service of the notice before foreclosure.

### II.

The Huethers next contend that FCB failed to comply with the Agricultural

Credit Act of 1987. Administrative forbearance regulations were adopted by the Farm Credit Administration in furtherance of Congress' goal under the Farm Credit Act of fostering agricultural development. *See, Federal Land Bank of St. Paul v. Lillehaugen,* 404 N.W.2d 452 (N.D.1987). Forbearance simply means some delay in enforcing the debt by the exercise of patience and restraint which may depend upon appropriate conditions. *Federal Land Bank of St. Paul v. Halverson,* 392 N.W.2d 77, 82 (N.D.1986).

The requirements on the part of FCB are twofold: (1) to establish a general policy of forbearance; and (2) to follow the policy in arriving at a decision to seek foreclosure. *See Federal Land Bank of St. Paul v. Overboe,* 404 N.W.2d 445 (N.D.1987). In analyzing the requirements on the part of the lender, we have said:

"[W]hen a borrower relies on the administrative forbearance defense in a mortgage foreclosure action, the court should initially make findings of fact on whether a forbearance policy has been adopted and, if so, whether that policy was applied to the borrower in the case before it, *i.e.,* whether the borrower's qualifications for forbearance relief were considered in accordance with the policy. If an administrative forbearance policy has not been adopted or the borrower's qualifications for forbearance have not been considered, then foreclosure is not available. If, however, a policy has been adopted and the borrower's qualifications for forbearance have been considered, judicial review of the substantive decision about forbearance is limited."

*Federal Land Bank of St. Paul v. Asbridge,* 414 N.W.2d 596, 599 (N.D.1987).

It is undisputed that FCB has adopted a forbearance policy which was in effect at all pertinent times in this case. That policy states that:

"[F]orbearance will be granted upon written request of a borrower in cases where in the opinion of the FCS loan officer handling the matter:

A. The borrower is cooperative; and

B. The borrower is making an honest effort to meet the conditions of the loan agreement; and

C. The borrower is capable of working out of the debt burden."

The district Farm Credit Services (FCS) office, located in St. Paul, Minnesota, also adopted the following policies pursuant to the 1985 Farm Credit Act amendments:

"FCS institutions shall inform borrowers that they may request forbearance in writing. Borrowers requesting forbearance must provide information considered relevant to determining their qualification for such action. FCS institutions shall promptly notify borrowers in writing of actions taken on forbearance requests and, when denying forbearance, identify reasons for denial.

"FCS service centers shall promptly inform borrowers who are denied forbearance that they may obtain review of such decision in person by a credit review committee. Such committee shall consist of a majority of individuals who were not involved in making the adverse decision, including a service center farmer director. If the borrower is not cooperating or adequately protecting the loan security or is otherwise violating the mortgage or security agreement terms, the service center reserves the right to deny a review."

The Huethers contend that they were not given proper consideration for forbearance, that their right to forbearance was never properly denied, and thus, they were denied their right to appeal the adverse decision.

▌ There is a dispute in the evidence as to exactly what the Huethers were informed of by Corey Wolff, their local branch manager of FCS.[3] A letter dated April 4, 1986, from Corey Wolff to William Huether was received in evidence as Plaintiff's Exhibit 4. Attached to the letter was a packet of information containing five pages of the forbearance policy and a statement of the rights of the Huethers pursu-

---

3. Farm Credit Services (FCS) is the Department which is responsible for dealing with borrowers in connection with loans from Farm Credit Bank.

ant to that policy. Huether's counsel objected to the admission, stating that the letter was not authenticated, that it was hearsay, and that this was the first time he and his clients had seen the attachments to the letter.[4]

Although the employee who wrote and mailed the letter did not testify, the documents were received into evidence pursuant to section 31–08–01, N.D.C.C., and Rule 803(6), N.D.R.Ev.,[5] which make regularly kept business records competent evidence. The requirements for such an admission are as follows:

"A record of an act, condition, or event shall be competent evidence insofar as relevant, if:

1. The custodian or other qualified witness testifies to its identity and the mode of its preparation.

2. It was made in the regular course of business, at or near the time of the act, condition, or event.

3. The sources of information and the method and time of preparation, in the opinion of the court, were such as to justify its admission."

Section 31–08–01, N.D.C.C.

Robert Wingenbach, Director of Special Credit for FCS, testified that the letter and the attachment were a part of the business record retained by FCS as to the Huether's financial condition. He also testified that at the time of the mailing of the letter, he was the Director of Special Services and thus supervised the issuance of such notices. Thus, we see no abuse of discretion by the trial court in receiving the documents into evidence under the "business records" rule.

William Huether did not deny receiving the information packet in Exhibit 4, nor any of the other correspondence from FCS and Mr. Wolff, but he repeatedly stated that he could not remember what he had received. Patricia Huether testified that Wolff had not informed them of their right to appeal nor of their right to make the interest payments and defer the principal.[6]

### III.

Interwoven into the Huethers' contention that they did not receive proper consideration for forbearance is their contention that the FCB also failed to comply with their rights to restructure the debt under the Agricultural Credit Act of 1987. A pertinent part reads:

"Each qualified lender that has a distressed loan outstanding that is subject to restructuring requirements under this chapter shall provide, in accordance with regulations prescribed by the Farm Credit Administration, the borrower with prompt written notice of—

(1) any action taken with respect to restructuring the loan under section 2202a of this title;

(2) if restructuring is denied, the reasons for such action; and

(3) the borrower's right to review under section 2202 of this title."

---

4. The Huethers also object to the admission of the April 4, 1986, letter and its attachments because there is no reference in the letter to any attachments.

5. Rule 803(6), N.D.R.Ev., reads as follows:

"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

\*    \*    \*    \*    \*    \*

"(6) *Records of Regularly Conducted Business Activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

6. FCS Policies and Procedures provide that:

"FLB institutions shall not initiate foreclosure on a borrower who is unable to make principal payments if the borrower remains current on the interest portion of the payment and maintains positive communication and coordination with the institution."

12 U.S.C. § 2201(b). The Act also provides that:

> "[W]hen a system lender determines that a loan is or has become distressed, the lender must provide written notice to the borrower that the loan may be suitable for restructuring. 12 U.S.C. § 2202a(b)(1). If the lender determines that the potential cost of restructuring the loan is less than or equal to the potential cost of foreclosure, the lender must restructure the loan. 12 U.S.C. § 2202a(e)(1). The Act further provides that no lender may foreclose or continue any foreclosure proceeding with respect to any distressed loan before the lender has completed any pending consideration of the loan for restructuring. 12 U.S.C. § 2202a(b)(3)."

*Federal Land Bank of St. Paul v. Bosch,* 432 N.W.2d 855, 858 (N.D.1988).

The Huethers were sent, and do not deny receiving, the necessary information on the process of applying for restructure and the forms necessary to do so. They contend, however, that they could not complete the forms because the Farmers Home Administration would not release the financial information they needed to complete the forms. FCS was informed of the inability of the Huethers to complete the forms for restructure on April 5, 1988, by a letter from the Huethers' attorney.[7] FCS responded with a letter stating that the Huethers had failed to perform within the given time period and that they were there-

fore going to proceed with the foreclosure proceeding.[8] FCB contends that the Huethers never provided the information required for a determination as to whether or not they were eligible for restructuring. In response to the requests for the information, FCB contends that the Huethers requested an extension of time to pay without submitting any specific proposal of restructure. Thus, FCB was unable to adequately assess the possibility of restructure and properly informed the Huethers that it would proceed with the foreclosure.

■ The Huethers contend that they were not informed after the last communication of their rights to seek a review of the denial of the forbearance and restructure pursuant to 12 U.S.C. § 2201(b) and FCS policies and procedures. The latter in reference to the right of appeal provides:

> "FCS policy assures applicants and customers their loan applications and loan servicing requests will be promptly considered and they will be promptly informed in writing of the decision. If the decision on loan applications and major servicing actions results in denial, reduction or other adverse actions, FCS, St. Paul, and service centers inform their respective applicants or customers in writing that they may request within 30 days of the notice of original action a review of such decision. FLB and PCA applicants or customers may obtain a

---

**7.** Pertinent contents of the letter of April 5, 1988, follow:

> "By this letter we are requesting the right to seek re-structuring of our loan under the Agricultural Credit Act of 1987. Because we are involved in litigation with the Farmers Home Administration regarding security interests in some of our property, we are unable to fully complete the application forms at this time. However, by this letter, we wish to inform you that we are exercising our right under the ACA 1987 and do intend to seek re-structuring of our loan with Farm Credit Services pursuant to the provisions of that Act as soon as possible."

**8.** FCS responded, through Mr. Robert Wingenbach, Director of Special Credit, to the April 5, 1988, request for restructure by letter dated April 8, 1988, as follows:

> "We have received your letter dated April 5, 1988 regarding the Agricultural Credit Act of 1987 as it relates to the Huether loan.
>
> "It is our understanding that the Agricultural Credit Act of 1987 allows the debtor additional time, consisting of 48 days, within which he must submit a completed application and packet of financial information relative to restructure under the Agricultural Credit Act of 1987. The law however does not simply allow the debtor to submit a letter through his attorney stating that he would seek restructuring under provisions of the Act and then not perform within the given 48 day period of time.
>
> "Therefore we will be instructing our legal counsel to proceed with the remedies afforded us under the state foreclosure law. If you have any questions regarding this matter, please direct them to our attorney, Malcolm Brown."

review of adverse decisions in person by a credit review committee."

The Huethers were previously supplied, however, with the forbearance and restructuring policies and procedures. Included in these materials was the following information:

"*Appeals*

"The association shall provide to borrowers requesting forbearance in writing prompt written notice of action on their request. If a borrower who receives written notice of a decision to decline forbearance requests in writing within 30 days after receiving such notice, the borrower may obtain review of such decision in person by the Association Credit Review Committee established by the board to hear such requests."

"REVIEW

"A borrower who has received notice of a decision to deny an application for restructuring may request a review of such decision by the appropriate credit review committee. Any request for review must be made in writing and received within 7 days (plus an additional 3 days if the lender's notice of denial is mailed) of the date of the lender's written notice of its denial of restructuring. The borrower may appear in person before the credit review committee, and may be accompanied by counsel or by any other representative of such person's choice, to seek a reversal of the decision on the application under review."

. We find that this information, provided prior to the last communication as to the Huethers' forbearance and restructure application, adequately informed them of their right of review.

▮ The Huethers also contend that Defendant's Exhibit "N" was improperly excluded by the trial court. Defendant's Exhibit "N" is a letter dated December 8, 1988, from Robert Wingenbach, Director of Special Credit for FCS, to Malcolm Brown, attorney for FCB. The relevant part of Exhibit "N" follows:

"It would appear that the documentation in the file as to restructuring is very limited. Part of the reason for this may be that it also appears that the documentation in the file would support that Mr. Huether has been less than cooperative in his efforts to resolve his financial situation at the Farm Credit Bank of St. Paul."

The letter was in a file which Wingenbach used while testifying on direct examination. Rule 612(a), N.D.R.Ev., provides:

"If, while testifying, a witness uses a writing or object to refresh his memory, an adverse party is entitled to have the writing or object produced at the trial, hearing, or deposition in which the witness is testifying."

Huether's counsel requested to see the entire file. The trial court ruled that Wingenbach was to identify the specific documents within that file that he had used in the course of his testimony to refresh his recollection of events. These documents were then to be subject to review by the Huethers pursuant to Rule 612, N.D.R.Ev. The trial court correctly ruled that the documents specifically referred to during testimony were subject to disclosure, even if previously privileged. *See S & A Painting Co., Inc. v. O.W.B. Corp.*, 103 F.R.D. 407 (W.D.Pa.1984) (waiver of attorney-client privilege occurred as to those portions of notes to which reference was made during deposition, but not to the bulk of the notes which were not referred to).[9]

Wingenbach identified the specific documents which he had referred to during his testimony and no objection was made by counsel for the Huethers as to the trial court's Rule 612 ruling. Defendant's Exhibit "N" was not one of the documents identified by Wingenbach, and thus was not subject to disclosure. FCB's counsel apparently surrendered the entire file to Huether's counsel pursuant to request during a recess. Huether's counsel extracted the December 8 letter and attempted to

---

**9.** While *S & A Painting Co., v. O.W.B. Corp.*, 103 F.R.D. 407, refers to Rule 612 of the Federal Rules of Evidence, we note that Rule 612, Fed. R.Evid., is substantially similar to Rule 612 of the North Dakota Rules of Evidence.

offer it in evidence. FCB's counsel objected that it was privileged communication between FCS and counsel. He stated that he had not realized the file he had given Huether's counsel contained such documentation.

■ The North Dakota Rules of Evidence provide a protection for certain communication between a client and his or her lawyer. Rule 502, N.D.R.Ev., in relevant part provides:

"*(b) General Rule of Privilege.* A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between himself or his representative and his lawyer or his lawyer's representative, (2) between his lawyer and the lawyer's representative, (3) by him or his representative or his lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another party in a pending action and concerning a matter of common interest therein, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

"*(c) Who May Claim the Privilege.* The privilege may be claimed by the client, his guardian or conservator, the personal representative of a deceased client, or the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence. The person who was the lawyer or the lawyer's representative at the time of the communication is presumed to have authority to claim the privilege but only on behalf of the client."

A communication is confidential if it is not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication. N.D.R.Ev. 502(a)(5). In a colloquy between the trial judge and Malcolm Brown, attorney for FCB, as to the inadmissibility of Defendant's Exhibit "N," Mr. Brown stated that the document had been prepared in the course of preparation for litigation.

■ The Huethers contend that the privilege was waived when the file was voluntarily given to their attorney. The trial court ruled that "[t]he privilege here is the privilege to the client. The client here did not furnish the information notwithstanding the fact that his attorney as his agent did do so." When a confidential communication is disclosed by counsel inadvertently, the question arises as to whether or not that disclosure constitutes a waiver of the attorney-client privilege. The effect of an inadvertent disclosure has not been briefed by counsel, but our research indicates that courts are not in agreement on this issue.

Difficult as the question may be, it seems to be resolved in our state through our adoption of Rule 511, N.D.R.Ev., which reads:

"A claim of privilege is not defeated by a disclosure which was (1) compelled erroneously or (2) made without opportunity to claim the privilege."

The Explanatory Note to that Rule contains the following statements:

"The second basis for exclusion is meant to deal with those instances in which disclosure is made by someone other than the holder of the privilege. This would include disclosure by a recipient of privileged information (*e.g. a lawyer*), one allowed to transmit privileged information (e.g., a lawyer's representative), or an eavesdropper, among others.

"It may be argued that once disclosure by a third party is made, the need for confidentiality ceases and, therefore, the privilege should not be maintained. However, with the increasing number and sophistication of intrusions into individual privacy, it is necessary to guard jealously those confidential communications deemed of such social importance as to warrant being privileged. This provision will maximize the effect of a given privilege, although, as may be argued, it

cannot totally repair a breach of confidentiality." [Emphasis added.]

Our research indicates that the Joint Procedure Committee of the North Dakota Supreme Court had before it, when it considered the proposed Rule 511 and the proposed Explanatory Note, a document entitled *Procedure Committee Notes*, which includes the item *Research Aids:* 2 Weinstein's Evidence ¶¶ 512[01]–512[02].

When we turn to the commentary in 2 Weinstein's Evidence ¶ 512[02] at p. 512–4, we note the following:

"Subdivision (b) of Standard 512 makes inadmissible evidence which was disclosed without the holder having an opportunity to claim his privilege. While it would cover situations where the non-holder party to a communication discloses without the holder's awareness, ethical considerations make such an eventuality unlikely in the case of a lawyer, psychotherapist or clergyman."

2 J. Weinstein & M. Berger, Weinstein's Evidence, Standard 512[02], at 512–4 (1989).[10]

Peripherally relevant for a better understanding of our law, as it relates to the attorney-client relationship, is Rule 510, N.D.R.Ev., which reads:

"A person upon whom a privilege against disclosure is conferred by rule or by law waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged."

It is interesting to note that Weinstein, in discussing Supreme Court Standard 511,[11]

which is quite similar to our Rule 510, has this to say:

"The most difficult problem which arises in connection with waiver is ascertaining at what point it becomes unfair for the holder to insist on having his privilege honored. Courts frequently resort to the metaphor that the privilege may be used as a shield but not as a sword. For example, when the question arises in the context of the attorney-client relationship, the client will be held to have waived his privilege if he makes a claim or defense embodying the subject matter of his communication with his lawyer." [Footnote omitted.]

2 J. Weinstein & M. Berger, Weinstein's Evidence, Standard 511[02] at 511–7 (1989).

We conclude, therefore, that the trial court was correct in finding no waiver of the attorney-client privilege in this case because there was no opportunity for the client, as the holder of the privilege, to claim the privilege.

■■■■ Lest it should be asserted that the client, as the holder of the privilege, had the opportunity through his attorney to claim the privilege and thus that Rule 511 could not apply, we are of the opinion, from our research, that the result would be the same and that there would be no waiver of the attorney-client privileged communication in this case for the reasons stated in our discussion of the effect of an inadvertent disclosure of a privileged communication by counsel.

One of the most recent cases of an appellate court that we have discovered on this subject is that of *Kanter v. Superior Court (Safeco Ins.)*, 206 Cal.App.3d 803, 253 Cal.Rptr. 810 (2 Dist.1988). In *Kanter*,

**10.** Standard 512 of the United States Supreme Court is quite similar to Rule 511, N.D.R.Ev. Standard 512 reads as follows:

"Evidence of a statement or other disclosure of privileged matter is not admissible against the holder of the privilege if the disclosure was (a) compelled erroneously or (b) made without opportunity to claim the privilege."

2 J. Weinstein & M. Berger, Weinstein's Evidence, Standard 512 at 512–1 (1989).

**11.** Standard 511 of the United States Supreme Court reads as follows:

"A person upon whom these rules confer a privilege against disclosure of the confidential matter or communication waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This rule does not apply if the disclosure is itself a privileged communication."

2 J. Weinstein & M. Berger, Weinstein's Evidence, Standard 511 at 511–1 (1989).

the court found an implied waiver of the attorney-client privilege when the attorney for Safeco, in response to a subpoena duces tecum turned over approximately 1,600 documents of which 160 were later identified as privileged. In commencing the discussion of the issue of the effect of an inadvertent production of a privileged document, the court said:

" 'The attorney-client privilege has been a hallmark of Anglo–American jurisprudence for almost 400 years. [Citations.] The privilege authorizes a client to refuse to disclose, and to prevent others from disclosing, confidential communications between attorney and client.... Clearly, the fundamental purpose behind the privilege is to safeguard the confidential relationship between clients and their attorneys so as to promote full and open discussion of the facts and tactics surrounding individual legal matters. [Citations.]' (*Mitchell v. Superior Court* (1984) 37 Cal.3d 591, 599, 208 Cal.Rptr. 886, 691 P.2d 642.) As such, courts have held that the privilege should be liberally construed. (*People v. Flores* (1977) 71 Cal.App.3d 559, 563, 139 Cal.Rptr. 546.)

"On the other hand, as a statutory creation, the privilege is an exception to the general rule requiring disclosure. (*Gonzales v. Municipal Court* (1977) 67 Cal.App.3d 111, 118, 136 Cal.Rptr. 475.) 'As an obstruction to the search for all relevant information, the privilege is to be strictly construed.' (*Ibid.*)

"Wigmore says of the privilege, '[i]ts benefits are all indirect and speculative; its obstruction is plain and concrete.... It is worth preserving for the sake of a general policy, but it is nonetheless an obstacle to the investigation of the truth. It ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.' (8 Wigmore, Evidence (McNaughton ed. 1961) § 2291, p. 554.)"

*Kanter,* 253 Cal.Rptr. at 813.

It appears that we may have a conflict here between two eminent authorities, *i.e.,* Wigmore on the one hand and McCormick on the other. For although the California

appeals court relies on Wigmore to find a waiver in the aforementioned case, the Court of Appeals of Michigan, in *Sterling v. Keidan,* 162 Mich.App. 88, 412 N.W.2d 255 (1987), found no waiver of the attorney-client privilege when the defendant inadvertently failed to remove a privileged document from a "fairly voluminous" file which the defendant turned over to the plaintiff. In concluding that there was no waiver because of the inadvertent nature of the disclosure, the Michigan appellate court said:

"We believe the attorney-client privilege to be sufficiently important to protect in this case by finding no waiver. As McCormick notes regarding privileges:

'They do not in any wise aid the ascertainment of truth, but rather they shut out the light. Their sole warrant is the protection of interests and relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.' McCormick, Evidence (2d ed), § 72, p. 152 (footnote omitted).

"Noting the fact that numerous authors have viewed privileges as hindrances and advocated narrowing them, McCormick adds:

'The privileges have survived largely unaffected by these winnowings of the law by eminent scholars and jurists who saw them as suppressing the truth, for it is evident that for many people, judges, lawyers and laymen, the protection of confidential communications from enforced disclosure has been thought to represent rights of privacy and security too important to relinquish to the convenience of litigants. Growing concern in recent times with the increase of official prying and snooping into the lives of private individuals has reinforced support for the traditional privileges and no doubt aided in the creation of new

ones.' McCormick, Evidence (2d ed.), § 77, p. 157 (footnotes omitted.)"

*Sterling*, 412 N.W.2d at 259-60.

In *Kanter*, the California Court of Appeals discusses the three general analytic approaches employed by courts in deciding the issue of the relationship between the inadvertent production of privileged documents and the waiver of the privilege.

The first approach it describes is the strict responsibility or automatic waiver test under which, once a privileged document is produced, the privilege is waived. It asserts that Wigmore is cited as the leading proponent of this approach.

The second approach it describes is the subjective intent to waive approach, in which the client's intent to waive, rather than the client's intent to disclose, is the focus of the waiver test. It asserts that under this analysis, the privilege is retained until the client affirmatively waives it, and thus, that any inadvertent disclosure would not waive the privilege. Apparently the key case supporting this approach is *Mendenhall v. Barber–Greene Co.*, (N.D.Ill. 1982), 531 F.Supp. 951.

"The *Mendenhall* court reasoned that since waiver imports the intentional relinquishment or abandonment of a known right, '[i]nadvertent production is the antithesis of that concept.' (*Id.*, at p. 955). Thus, *Mendenhall* wanted there to be more than negligence by counsel before the client could be deemed to have given up the privilege. (*Ibid.*)

"As support for its decision that the better-reasoned rule is that mere inadvertent production does not waive the privilege, *Mendenhall* cites *Dunn Chemical Co. v. Sybron Corp.* (S.D.N.Y.1975) 1975–2 Trade Cas. ¶ 60,561 at 67,463 and *Connecticut Mutual Life Insurance Co. v. Shields* (S.D.N.Y.1955) 18 F.R.D. 448, 451, which both hold that there must be evidence of the client's intent to waive."

*Kanter*, 253 Cal.Rptr. at 816.

The third approach which is the approach the California Court of Appeals adopts is entitled the "Evaluation of the Circumstances Approach," under which the courts make a decision based on an evaluation of the circumstances, rather than automatically finding a waiver or a retention of the privilege.

According to the California Court of Appeals, the reasonable precautions approach is more solidified in *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.* (S.D.N.Y.1985) 104 F.R.D. 103. Quoting further the California Court of Appeals states:

"The *Lois* factors are: reasonableness of the precautions to prevent inadvertent disclosure; time taken to rectify the error; the scope of the discovery; the extent of the disclosure; and the overreaching issue of fairness and the protection of a privilege judged against the care or negligence with which the privilege was guarded with care and diligence or negligence and indifference. (*Id.*, at p. 105).

"Since *Lois*, the weight of authority is that waiver can occur through inadvertence. (*Chubb Integrated Systems v. National Bank of Wash.* (D.D.C.1984) 103 F.R.D. 52, 67.) The trend is to base the decision on all the circumstances. (*Hartford Fire Ins. Co. v. Garvey* (N.D.Cal. 1985) 109 F.R.D. 323, 329.)

*Kanter*, 253 Cal.Rptr. at 818.

The California Court of Appeals in *Kanter* concluded that the attorney-client privilege was waived when it applied the *Lois* factors, particularly the one relating to the time taken to rectify the error when it found that the documents had been in the plaintiff's hands for fifteen months due to the lack of follow-up of the defendants who did not discover the error until it was brought to their attention.

Quite similar to the *Lois* factors are the factors described in *Parkway Gallery v. Kittinger/Pennsylvania H. Group* (M.D. N.C.1987) 116 F.R.D. 46, which we have elected to follow in our analysis today.

We recognize that when conduct reaches a certain point of disclosure, fairness requires that the privilege shall cease whether or not the result was intended, 8 J. Wigmore, Evidence § 2327 (McNaughton rev.1961). In *Parkway Gallery v. Kittinger/Pennsylvania H. Group*, 116 F.R.D. 46

(M.D.N.C.1987), the North Carolina district court held that in determining whether or not a document has lost its privilege through inadvertent disclosure, a court may consider the following factors: 1) reasonableness of precautions taken to prevent inadvertent disclosure in view of the extent of the document production; 2) number of inadvertent disclosures; 3) extent of disclosure; 4) delay and measures taken to rectify the disclosure, and 5) whether the overriding interests of justice would or would not be served by relieving a party of its error.

In analyzing these five factors, in light of the facts in this case, we note that FCB's counsel inadvertently turned the document over to Huether's attorney. 1) Counsel for FCB could have taken greater precautions to insure that there was nothing privileged in the file before permitting his witness to use it to assist him in his testimony and certainly before turning it over to opposing counsel to examine. Counsel's only excuse is that he mistakenly believed it was a different file, which did not contain any documents of correspondence between himself and FCB. 2) This document was apparently the only one asserted to be privileged out of an entire file of documents, but this is not a case involving thousands of documents where efforts were made to segregate the privileged from non-privileged, and a few privileged documents were missed as in *Lois Sportswear,* 104 F.R.D. 103. In *Lois,* the privi-

lege was upheld as to 22 documents out of some 16,000 pages inspected and, out of the 3,000 pages requested to be produced. 3) The document indicates that the documentation in the file as to restructuring was very limited, but explained that the reason may be that Huether had been less than cooperative. The disclosure was complete, but the significance is questioned, in light of the language of the document itself. 4) Counsel for FCB attempted to rectify the disclosure as soon as it was discovered, albeit after it was permitted to be photocopied, but within moments of its discovery. This is not a case where the disclosure document was in the hands of opponents for 15 months before the error was discovered as in *Kanter v. Superior Court,* 253 Cal.Rptr. 810. In *Kanter,* the court held that the inadvertent disclosure waived the privilege. 5) These facts present a close case but we believe that relieving FCB of its error under these circumstances is consistent with the purpose of the privilege which is designed for the client's benefit and generally advances the overriding interests of justice. Under these facts, were we to apply these factors, we would hold that the trial court properly ruled that the letter was subject to the lawyer-client privilege, that the privilege was not waived, and thus the letter was inadmissible. Notwithstanding, we do not believe that, had the district court admitted the document, it would have changed the result as the document [12] is quite consistent with the testimony of Wingenbach, the em-

12. The entire text of Defendant's Exhibit "N", a December 8, 1988, letter from Robert Wingenbach, Director of Special Credit for Farm Credit Services, to Malcolm Brown, attorney for FCB reads as follows:

"I have reviewed the file in the above matter with the intent of determining whether we have given restructure consideration pursuant to the recent State Supreme Court ruling on Peter Bosch.

"It would appear that the documentation in the file as to restructuring is very limited. Part of the reason for this may be that it also appears that the documentation in the file would support that Mr. Huether has been less than cooperative in his efforts to resolve his financial situation at the Farm Credit Bank of St. Paul.

"A summary of the documentation that I noted in reviewing the file is as follows:

"*April 23, 1986* we gave the member a Bank of North Dakota debt restructure packet. We never received any information back relative to this packet.

"*August 14, 1986* we sent a letter to the member requesting him to sign a consent form to get financial information from FmHA or from any other financial institution in lieu of his filling out our financial forms. We never received any information back.

"*February 19, 1988* we sent the Agricultural Credit Act packet of information and application form to the debtor.

"*April 5, 1988* we received a letter from attorney Tom Dickson asking to reserve the right to restructure according to the Agricultural Credit Act, but not to have to make the application at this time.

"*April 8, 1988* we sent a letter to attorney Dickson telling him to either make an applica-

ployee of FCB, who in essence testified that there was no restructuring of the debt because the Huethers made no offer and only sought delay. It is also consistent generally with the trial court's findings. The error, if any, was harmless error as not inconsistent with substantial justice.[13]

In granting the foreclosure, the district court, in relevant part found:

"X

"Pursuant to the Agricultural Credit Act of 1985 Plaintiff was required to follow certain policies and procedures with regard to forbearance of the Defendants Huether's loan. Plaintiff notified Defendants Huether of their rights pursuant to said Act and pursuant to said policies and procedures. Notwithstanding such opportunities granted by the administrative procedure of the Plaintiff herein with respect to the indebtedness of the Defendants Huether, said Defendants offered no defined or ascertainable program or proposal for loan restructuring or forbearance. The requests of the Defendants Huether to the Plaintiff were merely requesting the Plaintiff to indefinitely forego the collection of said indebtedness and accrued interest.

"XI

"The Defendants Huether have each suffered from severe health problems which have contributed to their inability to operate said farm property and make payment to the Plaintiff. However, said Defendants' ill health has not been shown to have precluded said Defendants from making reasonable efforts to restructure their indebtedness in a timely manner.

"XII

"The Plaintiff herein has responded appropriately to Defendants Huether's request for an absolute forbearance of all principal and interest for an indefinite period of time, absent any substantive proposal for payment of same. Defendants Huether, through this litigation and their petitions in bankruptcy which were dismissed, have in fact enjoyed a forbearance of principal and interest for the past three years.

"XIII

"The evidence also showed that in February 1988 Plaintiff notified Defendants

---

tion pursuant to the act or choose not to exercise his rights pursuant to the same.

"That is, basically, the extent [of] forbearance in this matter. At the time that the foreclosure was initiated, the member could not make the payment and did not have an affirmative plan on how to make the payment. At that time the member was also very much broke financially and the Farm Credit Bank of St. Paul was very well secured. At that time it would not have been prudent lending practice to excuse either principal or interest for the sake of restructuring the loan at a point where it would cash flow.

"How would you like to proceed with the testimony in this matter? Would you like Charles Erickson from Dickinson to also be present for testimony? The loan officer who was responsible for this file prior to the filing of bankruptcy was Cory Wolf. Cory Wolf no longer works for the association and I believe it would be difficult, if not impossible, to get him to testify on behalf of the association relative to forbearance. Mr. Erickson's involvement in this file was only to the extent of the bankruptcy proceeding. I was intending on testifying on general matters such as the current debt, the debt compilation, interest

rate policies, etc. As to specific issues, such as forbearance granted Mr. Huether, I would be able to testify only that, in my capacity, I have reviewed the file and the file would indicate whatever the file indicates. This testimony may be refuted by counsel for the debtor because I was not actually, personally involved in any loan servicing on the file. Please respond to me at your earliest convenience as to how you wish to proceed with the foreclosure testimony."

13. Rule 61, N.D.R.Civ.P., reads:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

See *Fronk v. Meager*, 417 N.W.2d 807 (N.D. 1987).

Huether of their rights under the Agricultural Credit Act of 1987 including the right to have their loan restructured. Defendants submitted no proposal to Plaintiff requesting restructure of their loan or requesting Plaintiff to take any other action permitted or required by the Agricultural Credit Act of 1987."

In determining the sufficiency of the evidence to sustain the trial court's findings of fact, the evidence must be viewed in a light most favorable to the findings. *Overboe, supra* at 450. A finding of fact is clearly erroneous under Rule 52(a), N.D.R. Civ.P., when, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Mertz v. Mertz*, 439 N.W.2d 94, 96 (N.D.1989); *Overboe, supra* at 450. A finding is not clearly erroneous merely because we might have reached a different result had we tried the case. *Overboe, supra* at 450; *Bye v. Elvick*, 336 N.W.2d 106, 110 (N.D.1983).

The evidence indicates that the Huethers were provided with the proper information pursuant to the Agricultural Credit Acts of 1985 and 1987. The correspondence between the parties indicates that they were apprised of their rights of forbearance, restructure, and appeal. The trial court could have reasonably concluded that the Huethers were never informed in writing of a final denial of forbearance or restructure because they did not provide the necessary information for such a decision to be made. The Huethers were supplied with the policies and procedures as to forbearance and restructure. Included in that information was the right of a borrower to seek review of an adverse decision.

Thus, we cannot say that the trial court's finding that FCB followed its procedures and guidelines is clearly erroneous. We conclude that the trial court did not err in approving FCB's foreclosure of its mortgage.

Accordingly, we affirm.

MESCHKE and VANDE WALLE, JJ., and VERNON R. PEDERSON, Surrogate Judge, concur.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of GIERKE, J., disqualified.

LEVINE, Justice, specially concurring.

I write specially to express my view that Rule 511, North Dakota Rules of Evidence, in conjunction with Rule 510, North Dakota Rules of Evidence, is sufficient to resolve the issue of the admissibility of Exhibit "N", the letter inadvertently disclosed by counsel for the Bank. Because the Bank, as holder of the privilege, did not have the opportunity to claim the privilege, it did not waive the privilege. Rule 511, NDREv; 2 J. Weinstein and M. Berger, Weinstein's Evidence, Standard 512[02], at 512–4 (1989); *see also* Explanatory Note to Rule 511, NDREv, quoted in the majority opinion, *supra*, at page 719.

In my view, case law from federal and state courts is not helpful, illuminating or determinative because of differing statutes, rules or "standards" governing waiver in those jurisdictions. In North Dakota, a lawyer cannot waive the privilege without consent of her client. *Id.* Under our rules of evidence, the client alone is keeper of the privilege. North Dakota has opted for the sanctity of client control of the privilege and its waiver in contrast with the differing positions of the several authorities cited by the majority. As the explanatory note to Rule 511 of the North Dakota Rules of Evidence explains, confidential attorney/client communications remain privileged, even when that confidentiality is breached, if the breach is committed by someone other than the client without the client's having an opportunity to claim the privilege.

I agree, therefore, that the trial court did not abuse its discretion in excluding Exhibit "N". I also agree that the judgment of foreclosure should be affirmed.

VANDE WALLE, J., concurs.